NORTHERN CENTRAL RY. (JACKSON v.).
See Case No. 7,142.

# Case No. 10,320.

## The NORTHERN INDIANA.

[3 Blatchf. 92;[1] 16 Law Rep. 433, 449.]

District Court, N. D. New York. 1853.

Circuit Court, N. D. New York. Nov., 1853.

COLLISION — STEAM AND SAIL — NEGLIGENCE OF STEAMER — DARKNESS AND FOG — SPEED — CLOSE-HAULED SCHOONER — LOOK-OUT.

1. Running a steamer of fifteen hundred tons burthen at the rate of seventeen miles an hour, along a track frequented by sailing vessels, when it is impossible, in consequence of a thick fog, or the darkness of night, to discern an approaching vessel in time to avoid running her down, is, of itself, conclusive evidence of such gross negligence or recklessness, as to render the steamer liable for all the damages occasioned by a collision between such steamer and another vessel, unless it is clearly proved that those in charge of the other vessel were also in fault.

2. In a night so light and clear as to render that degree of speed justifiable, the fact that a collision with a close-hauled schooner occurred while the latter displayed a plain light, and the signal lights required on the northern and northwestern lakes by the act of congress [9 Stat. 382], is enough to cast upon the steamer the burthen of establishing, by satisfactory evidence, that there was no want of care or skill on the part of those in charge of her.

[Cited in Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 26 Fed. 602.]

3. When a steamer, under a full head of steam, is about meeting a close-hauled schooner in an open lake, their courses being nearly opposite, the duty of checking speed and changing direction devolves upon the steamer alone, and the schooner has the right, and it is ordinarily her duty, to keep her course.

[Cited in The Osprey, Case No. 10,606.]

4. The want of a look-out, detailed and stationed for the constant performance of that specific duty, is, of itself, a circumstance of a strong, condemnatory character, and, in case of collision, exacts from the vessel neglecting it, clear and satisfactory proof that the misfortune encountered was not attributable to her misconduct in that particular.

[Cited in The Ancon, Case No. 348; M'Cabe v. Old Dominion S. S. Co., 31 Fed. 239; The Manhasset, 34 Fed. 419.]

5. The mate, while the officer of the deck, and holding temporary command of a steamer of fifteen hundred tons burthen, is continually liable to be called to the discharge of duties incompatible with the keeping of a constant and vigilant watch during the darkness of the night, and ought not to be relied on for that purpose. For such purpose, he would ordinarily be less reliable than the man at the wheel, when specifically charged with that additional duty; and it is well settled that the wheelsman is not a sufficient look-out for such a vessel under such circumstances.

[Cited in Baltimore & O. R. Co. v. Wheeling P. & C. Transp. Co., 32 Ohio St. 145.]

6. The inside of the pilot-house, on board of such a steamer, is not, in a dark night, the proper position for a look-out.

7. When the officer in charge of a steamer discovers the light of another vessel, and that there is danger of a collision, and cannot, by reason of darkness or fog, determine her position or her course with sufficient certainty to enable him to decide what change should be made in the steamer's helm, he should slacken and, if necessary, stop and reverse his engine, so as to diminish the speed of his vessel, until he is able to determine what change of direction will prevent a collision; and a failure to do so, connected with an improper order for the change of the helm, given in ignorance of the course and position of the other vessel, will render the steamer liable.

[Cited in The Free State, Case No. 5,090; The Louisiana, Id. 8,537; McWilliams v. The Vim, 12 Fed. 913; The City of New York, 35 Fed. 609.]

8. The cases of St. John v. Paine, 10 How. [51 U. S.] 557, and The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, referred to, and their doctrines applied.

9. It is no answer to proof of an excessive and unjustifiable rate of speed on the part of a steamer, while running in a dark night or in thick weather along the track of sailing vessels, that a reduction of speed would subject the steamer's owners to penalties for the non-performance of their contract with the post-office department. No contract with a public office, and no considerations of public convenience, can justify a rate of speed highly dangerous to the lives and property of persons pursuing their lawful business on the same route.

10. No precise rate of speed can ever be prescribed. It must depend upon the locality, and the particular and peculiar circumstances of each case; but it must not be such as cannot be maintained without probable injury to the lives and property of others.

[Cited in The Hansa, Case No. 6,037.]

Various libels in rem were filed in the district court against the steamboat Northern Indiana, to recover damages for a collision.

HALL, District Judge. Considerable time having elapsed since the argument of these causes, I have examined with great care the very full minutes of testimony taken by me at the hearing, and have endeavored to ascertain, with as much certainty as practicable, the material facts upon which the rights of the parties depend.

The testimony, as in most cases of collision, is indefinite and conflicting, and, in respect to questions of time and distance, necessarily conjectural and uncertain; but the most important questions of fact which arise in the case may, perhaps, be determined with quite as much certainty as in most cases of this character.

The libellants in these causes seek to recover the damages sustained by them respectively, in consequence of a collision between the steamboat Northern Indiana and the schooner Plymouth, on the 23d day of June last. The libellants in one of the suits were the owners of the Plymouth; and the libellants in the other cases were the owners of portions of her cargo.

The collision occurred on Lake Erie, about twenty-five miles northerly from Cleveland, Ohio, about one o'clock in the morning. The schooner sank a few minutes after the collision, and was, with her cargo, totally lost.

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

The witnesses differ somewhat widely in reference to the direction and force of the wind, the darkness of the night, and the density of the haze upon the water. The darkness and haze are represented by the claimants' witnesses to have been so thick as to prevent them from seeing the schooner in time to avoid the collision; while those on board of the schooner declare that the night was clear, with only a few small scattering clouds to obscure the bright star-light, and that the haze upon the water was so slight as not to materially obstruct the view of an approaching vessel.

There was no moon, and the night was not entirely clear; but, from the whole evidence, it may be safely assumed that, notwithstanding the slight haze upon the water, the night was not so dark, nor the weather so thick, as to render it impossible for those on board of the steamer to discern an approaching vessel in time to avoid a collision; nor so light as to excuse the slightest want of that sleepless vigilance and watchful care which the law requires of those having charge of the direction and speed of a steamer of the great size and power of the Northern Indiana.

The wind was blowing freshly, and the lake was somewhat rough. The steamer was making about seventeen miles an hour, and the schooner about seven and a half miles an hour, at the time those on board of each discovered that there was danger of collision with the other. The steamer was, therefore, running about fifteen hundred feet, and the schooner about six hundred and sixty feet, per minute.

The steamer was three hundred feet in length, and of the burthen of about one thousand five hundred tons. The schooner was one hundred and four feet in length, and of the burthen of one hundred and ninety-seven tons. The Plymouth was proceeding from Huron, in the state of Ohio, to Buffalo, New York. She was fully laden with wheat, flour, &c., and was steering northeast by east, with all sails set. The wind was from the north northwest, but was variable, veering, from time to time, a point or two to the northward. The schooner was, therefore, running by the wind, within a point or two of being close-hauled, and with her larboard tacks aboard. She carried the necessary lights, and was, in all respects, sea-worthy and sufficiently manned.

The alleged course of the schooner, with due allowance for lee-way, would probably have brought her to the place of collision; and it is therefore assumed that her courses, by the compass, were correctly stated by her captain and wheelsman. The steamer was proceeding from Buffalo, via Dunkirk, to Monroe, Michigan. About ten o'clock the previous evening, when a little below Ashtabula, and about five or six miles from land, her captain determined to proceed direct for the middle passage at the islands. The course of the steamer was therefore changed to south-west by west three-fourths west, as stated by those having charge of her direction. They also state that this course was not changed until the danger of a collision became apparent.

The steamer's course, from the point where her direction was thus changed, (judging from the chart produced on the trial, and conceded to be correct), should probably have been nearly west by south. It was, however, stated by her captain, that the compasses of different steamers frequently differ one or two points, and it will, therefore, be assumed, that the course of the steamer, as indicated by her own compass, was correctly stated by the claimants' witnesses. Her real course must nevertheless have been nearly west by south, to have brought her to the place of collision; and this direction would have brought the two vessels somewhat nearer the angle at which they struck. The difference is, however, so small as not materially to affect the rights of the parties.

The schooner was struck on her starboard side, about midships, and nearly at right angles. The stem of the steamer was driven nearly to the centre of the deck of the schooner, which soon sank, and schooner and cargo were totally lost. In my judgment, these general facts are fully and satisfactorily established by the evidence. Portions of the testimony, bearing directly upon the questions raised by the respective parties, will be herafter stated somewhat in detail, and will be considered in connection with the general facts above stated. And this testimony will be deemed more or less reliable, as it is consistent, in a greater or less degree, with the conclusions already drawn from the whole evidence in the case.

In the view which I have taken of the case, it is unnecessary to examine in detail the testimony in respect to the darkness and haze, which, it was claimed by the persons on duty on board of the steamer, prevented an earlier discovery of the schooner. I hold it to be unquestionable, that running a steamer of one thousand five hundred tons burthen, at the rate of seventeen miles an hour, along a track frequented by sailing vessels, when it is impossible, with the greatest care and vigilance, to discern an approaching vessel in time to avoid running her down, is, of itself, conclusive evidence of such gross negligence, not to say recklessness, as to render the steamer liable for all the injury caused by a collision; unless, indeed, the other party is clearly in fault.

The claimants' case is full of difficulty, upon either view of the testimony. If the night was so thick and dark that the schooner could not, with proper care, have been discovered in time to avoid the collision, the steamer's liability necessarily follows the proof that she was running at the rate of seventeen miles an hour; and, if the night was so light and clear as to render that degree of speed justifiable, the fact that the collision

occurred while the schooner was carrying a plain light on her jib-boom, and a green signal light on her pawl-bitts, is enough to cast upon the claimants the burden of establishing, by the most satisfactory evidence, that there was no want of care or skill on the part of those in charge of the steamer.

It cannot be necessary to refer to authorities to sustain these propositions, or to discuss, at much length, the several questions raised in these cases; but the alarming frequency of collisions and accidents upon Lake Erie, and the manifest want of care and skill disclosed by the evidence in these cases, and in another tried at the same session of this court, will perhaps justify the citation of English and American authorities, and a more full discussion of some of the questions presented. This discussion, it is hoped, may lead those engaged in lake navigation to inquiry and reflection; and to the exercise of that extreme care demanded alike by the public safety and private interest.

Before proceeding to the examination of the grounds upon which the libellants rest their allegations of negligence and misconduct against those in charge of the steamer, I shall consider that branch of the claimants' defence which urges, that the negligence and misconduct of those who had charge of the schooner, either caused the collision, or contributed to produce it.

It was contended by the claimants, that the libellants, were not entitled to a decree, because the proof did not show that the schooner exhibited the necessary lights, prior to and at the time of the collision; and because the schooner did not change her course in time, and avoid the steamer—especially as the look-out and wheelsman of the schooner saw the light of the steamer fifteen or twenty minutes before the collision, and made no effort to avoid her, until it was too late to escape by a change of the course of the schooner.

The captain, wheelsman, look-out man, and one of the seamen of the schooner, swear distinctly that they saw the lights on the jib-boom end and pawl-bitts, and that they were burning immediately before, or else immediately after, the collision; and, if these four witnesses are to be believed, the schooner's lights were unexceptionable. These witnesses are, to some extent, corroborated by the witnesses for the claimants. The mate of the steamer swears that he saw the schooner's light shortly before the collision, and the wheelsman of the steamer also swears that he saw the plain or jib-boom light a little more than a minute before the collision occurred. Upon this evidence, I cannot doubt that the schooner's lights were sufficient. This point of the defence is, therefore, overruled.

That the schooner's course was not departed from, and that those on board of her made no effort to avoid the collision until her helm was changed after the danger became imminent and unavoidable, is doubtless established by the evidence. It therefore becomes necessary to inquire, what was the duty of the schooner under the circumstances?

The two vessels were about meeting in the open lake. Their courses were nearly opposite, there being at most but about two points between them—the steamer under a full head of steam, and the schooner nearly close-hauled. In my judgment, it was the right of the schooner to pursue her course, and the duty of the steamer to avoid the schooner, if the night was such as to enable those on each vessel, by keeping a vigilant watch, to determine, in due time, the position and course of the other. The evidence satisfies me that this might have been done on the night in question, and that the collision was caused by negligence and inattention, and not by a reckless determination to maintain an immoderate speed when it was impossible to discover a vessel or her lights in time to avoid a collision.

The movements of a steamer are always under control. Her course can be changed at will, and much more readily than that of a close-hauled sailing-vessel; and her motion may be checked, or even reversed, in an almost incredibly short space of time. The first engineer of the steamer stated, on his examination, that when the steamer was running at the rate of seventeen miles an hour, the proper signals for checking, stopping, and backing, could be given through the bells, the wheels be reversed, and the speed of the steamer be so far checked as not to injure a vessel by collision, while the steamer was running twice and a half or three times her length (750 or 900 feet), and that, if running at the rate of twelve miles an hour, only two-thirds that number of feet would be required for that purpose. In this case, the speed of the steamer might have been so checked, after there was not more than one thousand feet between the vessels, as to prevent the collision, or so diminish its force as to render the damage comparatively trifling; and, with no more than two or even four points between the courses of the two vessels, the course of the steamer might have been so changed, when not more than six hundred feet distant, as to have avoided this small schooner.

I shall, therefore, hold, that the duty of checking speed and changing direction, to avoid a collision, devolved upon the steamer alone, and that the schooner had the right to keep her course. The cases of The Perth, 3 Hagg. Adm. 414; The Iron Duke, 2 W. Rob. Adm. 377; The Rose, Id. 1; St. John v. Paine, 10 How. [31 U. S.] 557; The Genesee Chief v. Fitzhugh. 12 How. [53 U. S.] 443, are deemed abundant to sustain this position.

In the case of St. John v. Paine [supra]. the court declared (page 583) that steam vessels are regarded "in the light of vessels navigating with a fair wind, and are always un-

der obligations to do whatever a sailing vessel going free or with a fair wind would be required to do under similar circumstances. Their obligation extends still further, because they possess a power to avoid the collision, not belonging to sailing vessels even with a free wind, the master having the steamer under his command, both by altering the helm and by stopping the engines. They are, also, of vast power and speed, compared with craft on our rivers and internal seas propelled by sails, exposing the latter to inevitable destruction in case of collision, and rendering it at all times difficult, and not unfrequently impossible, to get out of their way. Greater caution and vigilance are, therefore, naturally to be exacted of those in charge of them, to avoid the danger of the navigation. This justly results from the superior power to direct and control the course and speed of the vessel, and the serious damage consequent upon a failure to avoid the dangers. As a general rule, therefore, when meeting a sailing vessel, whether close-hauled or with the wind free, the latter has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her. The Shannon, 2 Hagg. Adm. 173; The Perth, 3 Hagg. Adm. 414; The Rose, 2 W. Rob. Adm. 1; Hawkins v. Dutchess & O. Steamboat Co., 2 Wend. 452; 3 Kent. Comm. 230; Abb. Shipp. (Boston Ed. 1836) 228. By an adherence to this rule on the part of the sailing vessel, the steamer with a proper lookout will be enabled, when approaching in an opposite direction, to adopt the necessary measures to avoid the danger, as she will have a right to assume that the sailing vessel will keep her course. If the latter fails to do this, the fault will be attributable to her; and the master of the steamer will be responsible only for a fair exertion of the power of his vessel to avoid the collision, under the unexpected change of the course of the other vessel and the circumstances of the case."

Another complaint in respect to the management of the schooner rests upon the allegation that her wheelsman put his helm up, after the danger became imminent. This fact was established by the testimony of the wheelsman himself. But he also swore, that it was not done until the danger was imminent, and that there was not sufficient time after that, and before the collision occurred, for the schooner to have answered her helm. The other testimony in the case is strongly corroborative of the wheelsman on this point; and there is certainly no reason to suppose that putting the helm up changed the course of the schooner to such an extent as to produce or aid in producing the collision. It may also be observed, that the helm was changed under circumstances similar to those referred to by Chief Justice Taney in the case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 461, when he said: "Nor do we deem it material to inquire whether the

order of the captain, at the moment of the collision, was judicious or not. He saw the steamboat coming directly upon him, her speed not diminished, nor any measures taken to avoid a collision. And if, in the excitement and alarm of the moment, a different order might have been more fortunate, it was the fault of the propeller to have placed him in a situation where there was no time for thought, and she is responsible for the consequences. She had the power to have passed at a safer distance, and had no right to place the schooner in such jeopardy that the error of a moment might cause her destruction, and endanger the lives of those on board. And, if an error was committed under such circumstances, it was not a fault."

It was also contended, by the advocates for the claimants, that they had proved, by their own wheelsman, that the wheelsman of the schooner stated, after the collision, that "he put his helm down; he believed it would have been better if he had kept his helm up; and he believed, if he had done so, the vessel would not have hit." This was denied by the wheelsman of the schooner, who stated that he kept his helm up, (after it was changed when the danger became imminent), until the vessels struck, and then put it down; and that he did not tell the wheelsman of the steamer that he put his helm down and changed the course of the vessel before the collision. The evidence in regard to the swinging of the schooner after the collision, and her present position, as she lies in the water, the change of the helm of the steamer, and the angle at which the vessels struck, render it quite clear, that whatever change was made in the schooner's helm, her course was not altered to such an extent as to contribute to the production of the injuries of which the libellants complain.

Having thus disposed of the question of negligence or misconduct on the part of those navigating the schooner, it becomes necessary to inquire, whether the collision was the result of inevitable accident, or of negligence, misconduct, or want of skill on board of the steamer.

The evidence on the part of the claimants shows, that the mate of the steamer had charge of her deck at the time of the collision; and that he, together with the wheelsman, was in the pilot-house when they first discovered the lights of the schooner. The wheelsman was at the wheel, and the mate was sitting at an open window, at the right of the centre of the forward part of the pilot-house. The mate and wheelsman agree in stating that, when they first discovered the schooner's light, it was about a point or a point and a half to the larboard of the steamer's course, and that they supposed the schooner was then some four hundred and fifty feet from the steamer. They declare that the night was dark and the weather thick; that there was a haze upon the water; and that a vessel's light could not be seen

more than a quarter of a mile. The mate swears that the moment he saw the light, and before he ascertained the course of the schooner, he ordered the helm hard a-port, saw the wheelsman commence executing his order, and then passed around the wheel, and went out on the opposite side of the pilot-house, and on to its top; that he then first saw the vessel which he had been unable to see when sitting in the pilot-house; that he thereupon instantly rang the bells for checking and backing the engines, and that he knew the wheels had been reversed before the collision, because he saw in front of the wheels the white foam caused by their reversed motion.

The watchman's statement is not only different but extraordinary. He swears that he was standing on the larboard side of the lower deck, about thirty-eight feet aft from the cut-water, and had been there about two minutes before the collision, looking nearly in a straight direction ahead, but along the larboard bow; that he was looking out for obstructions; that he saw no light, but saw the schooner; that it did not exceed a minute from the time he saw the schooner to the time of the collision; that the moment he saw the schooner he heard the engine bells ring—first, three taps to check, then one to stop, and then one to back the engine; and that the engine was stopped half a minute before the collision. And yet he swears that he does not think the schooner was more than her length (one hundred and four feet) from the steamer when he first saw her. On his cross-examination he swore, that the backing bell rang half a minute or a minute before the collision, and also that he thought the speed of the steamer was lessened nearly one-third after the wheels were reversed, before the collision occurred.

The first engineer of the steamer swears, that he was about twenty-five feet from the engine when the engine bell first rang; that the bells for checking, stopping, and backing were rung in quick succession, and answered as rapidly as possible by himself and the third engineer; that, after the wheels were reversed, they made between one and a half and two revolutions backwards before the vessel struck; and that it would take a little less than a minute to make these revolutions.

The third engineer agrees with the first in stating that the wheels made between one and a half and two revolutions after they were reversed, and before the collision; and he states that it would take half a minute to make these revolutions.

There is some other testimony on behalf of the claimants, but it does not materially conflict with the testimony of the mate and wheelsman, in respect to the position and proximity of the schooner when first discovered, or change the aspect of the case in reference to the sufficiency of the look-out, or the effort made to avoid the collision.

Upon the whole evidence, I am entirely satisfied that the collision was not the result of inevitable accident, but was caused by negligence and want of skill and care on board of the steamer.

1. There was no sufficient look-out. The steamer was running along a track where vessels are accustomed to meet, and in a night so dark as to render more than the usual precautions absolutely necessary. While the great speed of the steamer made it the imperative duty of those engaged in her navigation to exercise extraordinary vigilance to secure from danger the lives and property of others pursuing their lawful business along the same route, the usual and ordinary precautions required in clear weather, and in nights not unusually dark, were not adopted.

The ony persons on duty on board of the steamer, at and immediately before the collision, were the first and third engineers, below, and the mate, wheelsman, and watchman, on the decks. The engineers were both out of the engine room—the first engineer at the gangway, some twenty-five feet distant; and the third engineer just outside of the door, and looking into the engine room. The mate was in the pilot-house, with and near the wheelsman, and the watchman was, as he says, on the forecastle deck, about thirty-eight feet abaft the stem.

The mate was the officer of the deck, and the wheelsman was employed in his proper duty at the wheel. The business of the watchman, who was called a "look-out" by the advocates for the claimants, was stated by himself to be, "to look out for the welfare of the boat in general—to look out for the fires, pumps, baggage, lights, and trimming of the boat—to look out ahead, what time I have—to relieve the man at the wheel, or the mate, if he wants to leave the deck." The duties of such a "look-out" are altogether too general and multifarious to be of any particular service in guarding against collision on board of a steamer running in a dark night at the rate of seventeen, or even twelve, miles an hour.

The decisions of the courts of admiralty in England, and of the supreme court of the United States, have declared, in distinct and explicit language, the necessity of "stationing," in the most appropriate position, at least one person, too look out for approaching vessels. It was declared by the supreme court of the United States, in the case of St. John v. Paine, 10 How. [51 U. S.] 557, 585, that "a competent and vigilant look-out, stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching, at the earliest moment, is indispensable, to exempt the steamboat from blame, in case of accident in the night-time, while navigating waters on which it is accustomed to meet other water craft." And it was added: "There is nothing harsh or unreasonable in this rule; and its strict observance and enforcement will be found as beneficial

to the interests of the owners as to the safety of navigation; a remark equally true in respect to all other nautical rules which, the results of experience have shown, enter so materially into the proper management of the vessel."

In the case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, 463, Chief Justice Taney, in delivering the opinion of the same court, used the following language: "It is the duty of every steamboat traversing waters where sailing vessels are often met with, to have a trustworthy and constant look-out, besides the helmsman. It is impossible for him to steer the vessel and keep the proper watch, in his wheel-house. His position is unfavorable to it, and he cannot safely leave the wheel, to give notice, when it becomes necessary to check suddenly the speed of the boat. And, whenever a collision happens with a sailing vessel, and it appears that there was no other look-out on board the steamboat but the helmsman, or that such look-out was not stationed in a proper place, or not actually and vigilantly employed in his duty, it must be regarded as prima facie evidence that it was occasioned by her fault. She has command of her own course and her own speed; and it is her duty to pass the approaching vessel at such a distance as to avoid all danger, where she has room; and, if the water is narrow, her speed should be checked, so as to accomplish the same purpose."

The English courts require even greater vigilance. In the case of The Europa (one of the Cunard steamers) 2 Eng. Law & Eq. 557, the look-out was adjudged insufficient by the high court of admiralty, and the steamer was condemned in damages, where a collision occurred during a thick fog, and in the path of vessels passing between England and this country, although it appeared that the second officer of the watch was on the bridge, a quartermaster on the topgallant forecastle, and another quartermaster at the con, besides the quartermaster at the wheel; and this, when the steamer was seen at a distance of twelve hundred feet, and was running only twelve and a half miles an hour, in the open sea, seven hundred miles from land.

The want of a look-out, detailed and stationed for the constant performance of that specific duty, is, of itself, a circumstance of a strong condemnatory character, and exacts, in all cases, from the vessel neglecting it, clear and satisfactory proof that the misfortune encountered was in no way attributable to her misconduct in that particular. Poole v. The Washington [Case No. 11,271]; The Emily [Cases Nos. 4,452 and 4,453].

No look-out was stationed on board of the steamer, as required by the cases in our supreme court. The watchman, or man of all work, who esteemed it his duty to look out ahead only when he could find nothing else to do in discharging his other multifarious duties, was not a proper or sufficient look-out,

even if he had the competent skill for that service. The mate was the officer of the deck, holding the temporary command of the vessel, and continually liable to be called to the discharge of duties inconsistent with the keeping of a constant and vigilant watch; and he ought not to have been relied upon for that purpose. In such a steamer as the Northern Indiana, his proper duties as officer of the deck would materially interfere with the attempted discharge of the additional duties of a look-out, and render him less reliable for that purpose than the person at the wheel, who, it has been seen, is always held insufficient. If the officer of the deck assumes to act as the look-out, the proof must be clear and satisfactory that he was, during all the time a look-out was material, in the proper position, and constantly and vigilantly discharging that duty.

If the officer of the deck could be considered a competent look-out, he was not, in this case, in a proper position, and his conduct, as proved by his own testimony, is conclusive evidence that he was himself conscious of his neglect. When he discovered the schooner's light, and saw that there was danger of collision, he first ordered the helm hard a-port, and then left his seat in the pilot-house, (in which he could not then see the schooner, or ascertain her course), and hastened to a more elevated position, better adapted to the purposes of a look-out, on the top of the pilot-house. When he reached that point, he could see the schooner and her relative position and direction, and then only did he ring the bells to slacken, stop and reverse the engine.

But we are not left to our own judgment and that of the mate, in reference to the necessity of selecting a better position than the pilot-house as the station for the look-out. In addition to the language of Chief Justice Taney, already quoted, it was said by Mr. Justice Nelson, in delivering the opinion of the court in the case of St. John v. Paine, 10 How. [51 U. S.] 585, already referred to: "We are also satisfied that the steamboat was in fault in not keeping at the time a proper look-out on the forward part of the deck; and that the failure to descry the schooner at a greater distance than half a mile ahead is attributable to this neglect. The pilot-house, in the night, especially if dark, and the view obscured by clouds in the distance, was not the proper place, whether the windows were up or down. The view of a look-out stationed there must necessarily have been partially obstructed."

In the case now under consideration, there is direct evidence of the unfitness of the position for the look-out on board of the steamer. While there, the mate could not discover the schooner, or determine her course, but he was able to do so as soon as he reached the top of the pilot-house. In the mean time, the steamer had proceeded with unabated speed, and her course had been changed in the wrong direction, by an order given in ig-

norance of the course and exact position of the schooner.

2. The mate was clearly in fault in ordering the helm hard a-port. The helm should probably have been ordered hard a-starboard; but, as the mate could not, at the time he first descried the schooner, determine what order he ought to give to the helmsman, he should have reduced the speed of the vessel at once, and as much as practicable, and only have given an order to change the course of the steamer after he had ascertained what order was necessary to prevent the collision. The Perth, 3 Hagg. Adm. 414; The James Watt, 2 W. Rob. Adm. 270.

There is little doubt that this mistaken order of the mate, (especially as he neglected to reverse it when he subsequently discovered the course of the schooner), was the real cause of the collision. If the steamer had kept her course, it is probable there would have been no collision; and I apprehend that there is not the slightest reason to doubt, that if the helm of the steamer had been put hard a-starboard at the time the schooner was first discovered, the steamer would have passed under the schooner's stern, and the collision would have been avoided. The contrary order caused the steamer to swing in such a manner as to appear to those on board of the schooner to be constantly changing her course, as she proceeded on her way, with a persevering determination to force a collision.

3. If, as was contended on the part of the claimants, the night was so dark, and the haze so thick, as to prevent those on board of the steamer from descrying the schooner in time to avoid a collision, the speed of seventeen miles an hour maintained by the steamer was wholly unjustifiable, and rendered her liable for all damages occasioned by the collision.

It was suggested by the advocates for the claimants, that rapidity in travel, and in the transmission of the mails, was in accordance with the spirit of the age, and that reducing the steamer's speed in consequence of the darkness of the night, would have subjected her owners to penalties for the non-fulfilment of their contract with one of the departments of the national government; and, they asked, if they could not run seventeen miles an hour, how fast could they run? A full answer to the suggestion was given by Lord Ellenborough, in a case where the driver of an English mail-coach was indicted at the Old Bailey for manslaughter, he having run over and killed a man in the public street. It was urged in his defence that, by contract with the post-office, he was compelled to go at the rate of nine miles an hour. Lord Ellenborough, adverting to that defence, in summing up, observed, that no contract with any public office, and no considerations of public convenience, could justify the endangering of the lives of his majesty's subjects. This

doctrine was properly applied by Dr. Lushington, in the high court of admiralty, in a case of collision. The Rose, 2 W. Rob. Adm. 1.

No precise rate of speed can ever be prescribed. It must depend upon the locality, and the peculiar circumstances of each particular case, but it must not be such as cannot be maintained without probable risk to the lives and property of others. The Europa, 2 Eng. Law & Eq. 557; Newton v. Stebbins, 10 How. [51 U. S.] 586, 606.

But, even when the rate of speed may be justified, if a corresponding degree of caution and circumspection be observed, a steamer will be held liable if all necessary precautions be not taken; and, for the rate of speed maintained by the steamer on such a night as that on which this collision took place, the watch on board the Northern Indiana was, as has been shown, entirely insufficient. The Europa, 2 Eng. Law & Eq. 557; The Virgil, 2 W. Rob. Adm. 201; The Itinerant, Id. 236; Jones v. The Hanover [Case No. 7,466].

Upon the whole case, I conclude that the speed of the steamer was unjustifiable, if the darkness and haze were such as probably to prevent an approaching vessel from being discovered by a proper look-out in time to avoid a collision; that the look-out was clearly insufficient, whether the night was as thick and dark as is represented by the claimants' witnesses, or as clear and light as is represented by the witnesses for the libellants; that the signals to check, stop and back the engines should have been given when the schooner was first discovered; that the order to put the helm hard a-port was the reverse of what it should have been; that the neglect to give the signals to the engineers in time, and the mistaken order to the helmsman, were the natural results of the ignorance of the course and exact position of the schooner; and that that ignorance almost necessarily resulted from the neglect to station a proper look-out at the point to which the mate himself deemed it necessary to hasten when he found there was danger of a collision. With these views of the case, I cannot fail to enforce the claims of the libellants, unless I disregard not only the dictates of my own judgment, but also the decisions of the supreme court of the United States— decisions which it is my duty as well as my inclination at all times to respect and follow.

A strict adherence by the district courts to the decisions of the supreme court, in the cases cited from 10 How. [51 U. S.] and 12 How. [53 U. S.] will lessen the number of collisions and accidents upon our inland seas, and these decisions I shall deem it my duty to uphold and enforce while I have the honor to sit in this court.

Decrees for the libellants will be entered for the amounts mentioned in the statements handed to the clerk.

The claimants then appealed to the circuit court.

John Ganson, for libellants.

Dennis Bowen, Henry W. Rogers, and John L. Curtenius, for claimants.

NELSON, Circuit Justice. I have examined the pleadings and proofs in this case, and entirely concur in the very able opinion delivered by the learned district judge in the court below, and in all the views there taken by him, and in the conclusions at which he arrived.

It would be a work of supererogation on my part to go over the case again. The proofs are clear and decisive, that the collision occurred through the failure of the mate and the hands on board of the Northern Indiana to properly observe the familiar nautical rules, in the navigation of their vessel, on the occasion and under the circumstances when the collision occurred, and especially through their not having a proper look-out at the time. If there had been one, there is nothing in the case to excite a reasonable doubt that the collision would have been avoided. If it could not have been, the navigation of Lake Erie must be perilous indeed; so much so as to put at fault all the safeguards that skill and experience have constructed to prevent these marine disasters. Decree affirmed.