## Case No. 17,049.

WAKEFIELD et al. v. The GOVERNOR.

[1 Cliff. 93.] 1

Circuit Court, D. Maine. Sept. Term, 1858.

COLLISION—STEAMER AND SAIL.

1. When a steamer and sailing vessel are approaching each other, and the sailing vessel is put on a new course, she is bound to keep it, and it is the duty of the steamer to keep out of the way.

[Cited in The Free State, Case No. 5,090; McWilliams v. The Vim, 12 Fed. 913.]

2. In the daytime, in good weather, in a place where there is no want of sea-room, and no obstructions to the navigation, the sailing vessel must hold her course, and the steamer must adopt the necessary precautions to avoid a collision.

[Cited in The Johnson, 9 Wall. (76 U. S.) 153; Creevy v. Eclipse Tow-Boat Co., 14 Wall. (81 U. S.) 203; Miner v. The Sunnyside, 91 U. S. 209.]

3. Precautions must be seasonable in order to be effectual, and if not so, and a collision ensues in consequence of the delay, it is no defence to say that the necessity of precautionary measures was not perceived until it was too late to render them availing.

[Cited in Judd Linseed, etc., Co. v. The Java, Case No. 7,559; The Sunnyside, Id. 13,620.]
[Cited in Baltimore & O. R. Co. v. Wheeling, P. & C. Transp. Co., 32 Ohio St. 144.]

Admiralty appeal from the district court of Maine, in a cause of collision.

The schooner Pennsylvania sailed from Boston on the 25th of May, 1856, laden with a cargo of merchandise, and bound on a voyage to Bath. While beating up the Kennebec river, about six o'clock in the afternoon of the following day, and when she was within two miles of her place of destination,

---

1 [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

the master discovered the steamer Governor approaching in a southerly direction. At that time the wind was fresh from the northeast, and the schooner was close-hauled on the larboard tack. The usual course of steamers was to pass to westward of the schooner; and the master of the schooner, supposing the steamer would pursue the usual track, kept his course until the steamer, notwithstanding she was heading directly for the schooner, approached within speaking distance. He then motioned for the steamer to pass to the westward, of which no notice was taken by the master of the steamer, and, finding that she would inevitably run into the schooner, he put his helm hard up; but the steamer struck the schooner on her larboard bow, occasioning considerable damage. Such was the case as alleged by the complainants [James Wakefield and others]. The answer set forth the circumstances as follows: Soon after the steamer left the wharf at Bath,—about six. p. m.,—the master discovered the schooner in the river some two miles below, beating up against the wind, which was fresh from the north, and when thus discovered she was near the eastern shore on her starboard tack, heading towards the western shore. Supposing the schooner would keep on that tack until she approached near the western shore, a direction was given to the steamer such as to carry her astern of the schooner. There was ample room for the steamer to do this, and it would have been safely accomplished if the schooner had kept her course and completed her starboard tack; but when the two vessels were no more than a quarter or a third of a mile apart, the schooner suddenly put about before she had approached as near to the western shore as it was her duty to have done; and after putting about, instead of hauling close to the wind, she paid off several points, thus throwing herself directly in the track of the steamer and across her path. Upon discovering the management of the schooner, the master of the steamer instantly caused the whistle to be sounded, and by voice and gesture endeavored to warn the schooner to change her course; and he also ordered the engines to be reversed, so that the speed of the steamer was retarded, if not wholly checked. Upon these statements in the pleadings and the evidence in the case a decree was entered for the libellants, in the district court. [Case unreported.]

Shepley & Dana, for libellants.

It is a general rule that a steamer is to be considered as a vessel having the wind free. 1 Pars. Mar. Law, 197, 198. When a steamer approaches a sailing vessel, the steamer is required to exercise the necessary precaution to avoid a collision. Oregon v. Rocca, 18 How. [59 U. S.] 570; New York & L. U. S. Mail S. S. Co. v. Rumball, 21 How. [62 U. S.] 372.

George Evans, for respondents, argued orally, but filed no brief.

CLIFFORD, Circuit Justice. All the witnesses who were on board the schooner testify that she was going in stays when they first saw the steamer, and that the steamer was then just leaving the wharf, which is on the western side of the river. Prior to tacking, the schooner had been standing in the opposite direction, heading to the shore from which the steamer started. When she tacked she headed to the eastern shore; and the witnesses of the libellants say that the wind was northeast, and that the two vessels were about a mile and a half apart at the time the steamer left the wharf. Some fifteen minutes elapsed after the steamer started before the collision occurred; and the witnesses on both sides agree that she was standing on a course inclining in a diagonal direction towards the eastern shore. She never changed her course from the time she left the wharf until the collision took place, although her master admits that the schooner had sailed a quarter of a mile on the larboard tack, and that at the time it occurred she was two thirds of the way across the river from the western shore. Among other things, he also states that the steamer left the wharf at six o'clock, that as she rounded the wharf he stepped forward into the pilot-house and saw the schooner midway the river, more than a mile distant, beating up against the wind. As he represents, the wind was then fresh from the north, and the schooner was on her starboard tack heading to the western shore.

Steamers, as it seems from the pleadings and evidence, usually pass down the western side of the channel; but the master testifies that, after seeing the position and course of the schooner, he made up his mind to go past her stern, and he complains, that after running a short distance, and before she had approached as near to the western shore as she might have done, she went about and headed in the opposite direction. Having tacked, he insists that she ought to have kept close to the wind, and he affirms, instead of doing so, her main sheet was eased, causing her to pay off. Other witnesses, examined by the claimants, testify to the effect that the schooner paid off immediately after she came about near the western shore. But the master testifies, without qualification, that it was necessary for him to ease her mainsail sheet in consequence of her crippled condition, and that he kept her within five points of the wind, which was as near as she would conveniently lay. Before tacking, the schooner was heading towards the western shore near Trufant's rock, and the weight of the testimony clearly shows that she proceeded as far on that tack as it was prudent for her to do. Most of the witnesses agree that she was going in stays when the steamer left the wharf; but even if the ac-

count of the matter as given by the master of the steamer be correct, that she had not then quite completed her starboard tack, still he must have known, when he set the course of the steamer, that the schooner would presently find it necessary to come about and proceed upon the other tack. He knew what the course of his own vessel was, and there is no good reason for believing that he was misled in regard to the direction of the schooner. Whatever alteration was made in her mainsail sheets took place immediately after she came about, and it is not believed that it was of a character to affect the question in dispute between these parties. After the schooner came about and was put upon the new course, she was bound to keep it, and it was the duty of the steamer to keep out of the way. The Genesee Chief, 12 How. [53 U. S.] 443; New York & L. U. S. Mail S. S. Co. v. Rumball, 21 How. [62 U. S.] 372. But the defence, as stated in the answer, is rested chiefly upon the ground that the schooner might have avoided the collision by coming up into the wind, or by paying off and heading south. Suggestions of that kind, under the circumstances of this case, are entitled to very little weight. Occurring as the collision did in the daytime, and in good weather, and at a place where there was no want of sea-room and no obstructions to the navigation, it is clearly a case where the rule applies that the sailing vessel shall keep her course and leave it to the steamer to adopt the necessary precautions to avoid a collision. That rule has been established upon great consideration, and will be enforced in every case where it applies. Repeated decisions of the supreme court have sanctioned the rule, and it is vain to suppose that it will now be relaxed or overlooked. Expert witnesses were examined by the respondents to show that it was not possible to sheer the steamer while she was under way, so as to have avoided the schooner in a less distance than a quarter or a third of a mile. Theoretical opinions must often be received with some qualification, but it is not necessary on the present occasion to determine whether those opinions were well or ill founded, for the reason that the schooner was seen by those on board the steamer at a much greater distance, and in ample time to have adopted every necessary precaution to have avoided the collision. Precautions must be seasonable in order to be effectual; and if they are not so, and a collision ensues in consequence of the delay, it is no defence to say that the necessity for precautionary measures was not perceived until it was too late to render them availing. Inability to avoid a collision usually exists at the time it occurs; but it is generally an easy matter to trace the cause of the disaster to some antecedent omission of duty on the part of one or the other or both of the colliding vessels. Suppose it to be true that the steamer, after she had approached within a certain distance of the schooner, was not then able to sheer so as to avoid the collision, still, the proof of that fact only constitutes no defence in this case, because the fault consisted in unnecessarily placing herself in that situation. Those in charge of her well knew that, by the rules of navigation, the schooner was bound to hold her course, and that it was the duty of the steamer to keep out of the way. They had every facility before them to enable them to perform that duty, and it is no defence to say that they did not commence their efforts in season to render them effectual, because it is that very delay which renders the vessel liable. For these reasons I am of the opinion that the decision of the district court was correct, and the decree is accordingly affirmed with costs.