McWILLIAMS *v.* THE VIM, etc.

HALLOWELL *v.* THE SAME.

*(District Court, S. D. New York. June 20, 1882.)*

1. COLLISION—OBLIGATION TO HOLD COURSE—RULE 23—LIGHTS.

In navigation in the night-time, and in plenty of sea-room, the obligation upon a vessel to keep her course, under rule 23, (Rev. St. § 4233,) arises from the time when the lights of the other vessel are seen, or ought to be seen, by a proper lookout, within the limits of two miles, prescribed by rule 3, at which distance lights should be visible.

2. SAME.

Where the schooner S., in the westerly part of Long Island sound, sailing in the channel course W. S. W., changed two points to the southward, to S. W., thereby heading nearly directly for a steam-tug, about a mile distant, whose lights were visible, but were not noticed,—the captain being diverted by a discussion with the pilot, who had just boarded her,—and there being plenty of sea-room to have kept his course, *held*, that the S. was within a distance subjecting her to the twenty-third rule, and that she must be held in fault and responsible for the collision which followed.

3. SAME—NEGLECT OF USE OF MEANS TO AVOID COLLISION.

The steam-tug V. having previously shaped her course to pass to the right, and having observed the schooner's change of course when about a mile distant, and having still abundant sea-room and time to pass on either side, *held, also,* responsible for the collision, for not having used promptly the means within her power to avoid it.

4. SAME—WHEN MUST STOP AND BACK.

It being claimed by the tug that the schooner's change of course showed her green light, so that she appeared to be crossing the V.'s course to the starboard side, (the schooner's red light being possibly obscured by her jib,) *held*, that the V. was not justified, under this appearance of the green light only, in continuing her course to starboard, but was bound to go to port, or to stop and back if necessary.

5. SAME—STEAMER TO KEEP OUT OF THE WAY.

A steamer bound to keep out of the way of a sailing-vessel is not relieved from this duty by a previous fault of the latter, but remains bound to use with promptness and diligence all remaining means reasonably within her power to avoid collision, and to make such practicable changes in her own navigation as may be rendered necessary by the faulty changes of the other.

Collision.

On March 5, 1880, as the barge George M. Wright, loaded with coal, was proceeding eastward at the entrance of Long Island sound, between Hart's island and Sand's point, at about half-past 4 in the morning, in tow of the steam-tug Vim, and lashed upon her port side, she was run into by the schooner Spartel, and so injured that she was shortly after beached. These libels were filed by the owners of the barge and of the Spartel to recover their respective damages. The barge being without fault, the controversy was between the Vim and the Spartel as to which of them was responsible for the collision. The night, being overcast, was a good one for seeing lights, and both vessels had all the regulation lights properly set and burning. The tide was flood, and the wind very light from the N. E., nearly directly aft of the course of the Spartel, a small two-masted schooner about 68 feet long, then sailing with her booms on the port side. The channel, as marked upon the chart for vessels coming west past Sand's point, is W. S. W.; from that point the course changes two points and a quarter to the S., namely, to S. W. $\frac{1}{4}$ S., and so continues between four and five miles. On the part of the Vim it was claimed that after seeing the lights upon the Spartel from one to two miles distant, she shaped her course to go to the right, but that shortly before the collision the Spartel changed her course to the southward, when it was too late for the Vim to avoid her; whereupon she reversed her engines, and, as claimed, was making stern-way when the Spartel struck the barge. On the part of the Spartel it was insisted that no change of course on her part was made, except the usual change to keep the channel course at Sand's point, which, as she claimed, was so far from the place of collision as to be no violation of the rule requiring her to keep her course. Each claimed that the other had not a proper lookout.

*E. D. McCarthy*, for libellants.

*Benedict, Taft & Benedict*, for the Vim.

*Goodrich, Deady & Platt*, for the Spartel.

BROWN, D. J. The weight of testimony is that the Spartel made no change in her course except the usual change in the vicinity of Sand's point from W. S. W. to S. W. $\frac{1}{4}$ S. This must be deemed therefore, to have been the change observed by those on board Vim, though it must have taken place when the vessels were further apart than the estimate given by the Vim's witnesses. Spartel, while upon her course of W. S. W. before reaching point, would show her red light only to the Vim, which was southward, upon a course which must have been very nearly

by ¼ N., the channel course. After the change of the Spartel to S. W. her green light would come into view; and as upon that course she would be headed nearly directly for the Vim, her red light ought also to have been seen by the latter. The Vim's witnesses, however, testify that it was shut out; and it may have been obstructed by the jib, as the sails were on the port side. The Vim had two light-loaded barges upon her starboard side. Her captain testifies that she was making about three knots against the tide; that the Spartel's red light was first seen a mile or two distant, about a couple of points off their port bow, and that the green lights of two other schooners were seen to the southward and astern of her; that she was then going about N. E. by E., and shaped her course to go between the Spartel and the other schooners; that when the Spartel changed so as to show her green light, the Vim blew one whistle, which was repeated when it was observed that she held on her new course, and then blew three whistles as an alarm signal, and then stopped and backed, so as to be making stern-way at the time of the collision. The pilot testifies that they kept porting all the time. The preponderance of evidence is, I think, unquestionably to the effect that the Spartel's change of course was made within such a distance from the Vim as subjects her to the operation of the twenty-third rule, requiring her to keep her course.

There is, perhaps, no definite limit of distance for the application of this rule in all cases. Special circumstances must doubtless modify any general rule in that respect; but where there are no special circumstances affecting the navigation under rule 24, it would seem that the limit of two miles, which is the distance prescribed at which lights must be made visible, ought also by necessary implication to be taken as the distance, if the lights are seen, within which vessels should be required to keep their course, and deviation from it be held to be at their own peril. If that rule is not applied in regard to navigation at night, provided the night is such that the lights could be seen at that distance; or, if not visible at that distance, then from the time when they are visible,—any different rule, which depends upon some less estimated distance of the vessels apart, and its supposed sufficiency to enable the other vessel to out of the way, would be attended with such uncertainty and xity as to be very embarrassing in practical application, and to defeat the very object of the rules enacted to ensure certainty safety in navigation.

In requiring the colored lights of vessels to be such as may be visible for two miles, it is necessarily assumed that safety in navigation ordinarily requires that the position and courses of vessels should be observable at that distance from each other in order that each may properly shape its course to avoid danger. The twentieth and twenty-third rules, requiring one vessel to keep her course and imposing the whole duty of keeping out of the way upon the other, are established in order to avoid conflicting changes by both. The vessel which is bound to keep out of the way must, therefore, have the right, under this responsibility which is cast upon her by the law, to shape her course as she deems best from the time and within the whole distance at which these colored lights are by law required to be visible for her guidance and governance; and this necessarily implies that the other vessel shall not, within the same limits, make any change of course which might thwart or embarrass the course of the vessel which is legally bound to keep out of the way. If the vessel bound to keep her course might lawfully change it at some indefinite point within these limits after the other's lights have become visible, except for special reasons under rule 24, then the other vessel, though bound to keep out of the way, could not, until that point were passed, shape her own course at all, except at the risk of being thwarted in her efforts to keep clear; and thus hesitation, uncertainty, and conflicting changes in navigation would be continued indefinitely within the limits of two miles, instead of that fixedness and certainty of action being secured which is the evident object of the rules. *The Oregon,* 18 How. 572.

As regards navigation in the night-time, I think, therefore, that vessels must be held subject to the twentieth and twenty-third rules from the time the opposing vessel's colored lights are first seen, or would be discovered by a proper lookout, subject to the qualifications of the twenty-fourth rule. From that time the one vessel has a right to shape her course so as to discharge with certainty and safety the duty of keeping out of the way imposed on her by law, and the other vessel within the same limits is prohibited from change except at her peril; and this view seems to be involved in the decision of Judge Nelson in the case of *The Scotia,* 5 Blatchf. 227. See, also, *The Great Eastern,* 2 Moore, P. C. (N. S.) 31, 44.

The evidence leaves no doubt in this case that the Spartel was far within this limit of two miles when her change of course was made. The place of collision, as appears from the great majority of witnesses, was about half a mile west of Sand's point. The master of the

barge, who is a disinterested witness, and the captain and pilot of the Vim, put it at that distance.   Schofield, the pilot, who was on board the Spartel, says the collision "was to the west of Sand's point, about half a mile from it."   The Spartel was making only from three to four knots with the tide, and the Vim no greater speed. The Spartel's change of course, as Schofield testifies, was made after he came aboard, "and a few minutes after passing Sand's point," from which it would follow that this change was less than half a mile from the point of collision; and as the two vessels were moving at about the same speed, it must have taken place, according to this testimony, when they were less than a mile apart.   There was nothing in the situation which required the schooner to change her course at Sand's point.   There was abundance of sea-room for nearly a mile to the northward, and she could without difficulty have continued her course of W. S. W., without change, far beyond the point of collision.   Had the change not been made she would have passed to the northward of the barge by a considerable margin, and her change of course must therefore be held to have been a violation of rule 23, and a fault which contributed to the collision.

This conclusion would have been reached even if it had appeared that the schooner's change of course had been made deliberately, and in view of the steamer ahead.   It is not affected by the circumstance, as clearly appears from the testimony, that the steamer had not been noticed, though plainly within sight at the time.   The captain testifies that he acted as lookout, standing by the starboard quarter, with no one forward.   Sand's point is the commencement of the pilotage ground coming into New York.   The pilot, Schofield, had boarded the Spartel shortly before reaching this point; but a discussion ensued between him and the captain concerning the terms on which he would leave the Spartel and go to one of the other schooners astern, and allow the captain to take the Spartel to New York.   The matter had not been settled at the time of the collision, and the pilot testifies that he had not taken charge of the schooner. It seems clear that this debate diverted the attention of the captain, and that little or no attention at that time was paid to other vessels. The captain testifies that when he first saw the Vim he saw both her colored lights directly ahead, three or four minutes after his change of course; so that it is clear this change was made without any reference to the Vim.   If he had observed her lights before this change, he would, therefore, have seen her at least two points off his port bow, and at a distance, as I find from the testimony, not vary-

ing greatly from one mile. Had he seen the Vim's lights in that position, it is not to be supposed that, having abundance of sea-room, he would have changed his course so as to steer directly towards her. This change of course, itself a fault under the circumstances, is therefore directly traceable to another fault—the want of a proper lookout. The captain, it is true, estimates the distance of the Vim at "probably a mile or so" when he first saw her lights, and that it was 10 or 15 minutes before the collision. Other testimony of his would indicate that she was then much nearer. He says: "I saw her coming right ahead for us;" and he says that he called the pilot's attention to her and asked if he had not better luff a little; that the pilot said, "Keep your course;" and that "she was then about half a mile away;" while the pilot testified that when the captain thus called his attention to the Vim she was "but a quarter or perhaps not more than an eighth of a mile away, and right ahead, and this was about 10 minutes after the change of course." It seems clear, therefore, that the Spartel must be held in fault, both for the want of keeping a proper lookout, and for an improper change of course resulting from it, which contributed to the collision. *The Osseo,* 16 Blatchf. 537.

I think it is also clear that the Vim did not, after the Spartel's change of course, perform her whole duty to keep out of the way of the schooner. The schooner's change of course, though a fault, because made when only about a mile distant and after the Vim had shaped her course to go to the southward of her, must, nevertheless, have been perfectly understood by the captain of the Vim, because it was made, as the evidence shows, at the usual place of change, following the channel course. This change, as several witnesses testify, brought the green light in view and shut out the red. Those in charge of the Vim must have known, therefore, that the schooner had either changed to the channel course, with her red light obscured by the jib, or else changed still further to the south, so as properly to shut out the red light. In this uncertainty the Vim was not justified in keeping upon a southerly course to pass to the right. That course apparently tended directly towards a collision, and it so resulted. The weight of the testimony on the Vim's part is much weakened by the very great error in the distance ascribed to the schooner, *i. e.*, an eighth of a mile only, when this change in her course was made. The distance, as I have said, must have been nearly a mile, and the difference is of the greatest importance as respects the duty and responsibility of the Vim. The error in this

respect obliges me to disregard the testimony, which other circumstances make improbable, that at the time the schooner changed her course she was "about two points on the port bow" of the Vim. The necessary situation in passing Sand's point was such, at the time of her change of course, that the Spartel could not have been two points off the Vim's port bow, unless the latter were either previously far to the northward of her usual course, or else were so headed as to run upon Sand's point, only a mile distant, both of which are altogether improbable. When the Vim was first seen from the Spartel, though it may have been only an eighth or a quarter of a mile distant, all their witnesses testify that both the Vim's colored lights were seen, and seen nearly directly ahead. The Spartel, at the time she made the change, must have proceeded very nearly in the channel course, as the narrow channel between Sand's point and Execution rock would not admit of much variation in her position, and her subsequent course was south-west; hence, if both the Vim's lights were visible directly ahead when the schooner was an eighth or a a quarter or a half of a mile away, as all her witnesses testify, either the Vim could not have ported much before that time, or, if so, she must previously have been going to the northward of her true course, and the Spartel must, in that case, have been seen on her starboard bow, of which there is no evidence at all. Her captain testifies that his course was about N. E. by E., or a point and a quarter to the southward of the channel course. In that case, if the Spartel passed, as the pilot testifies, on the southerly side of the channel, i. e., nearer to Sand's point, both of the Vim's colored lights might have been seen ahead as described.

From all these circumstances it must be held that the Spartel, at the time of her change of course, when a mile distant, so as to show her green light, must have been nearly directly ahead of the Vim, and that, considering the schooner's slow speed, abundant time and room remained to the Vim to keep out of her way by going upon either side of her. I think it clear that she would, in fact, have done so by putting her helm much less than either hard a-port or hard a-starboard. That her wheel was ported tardily, and but slightly and ineffectively, is evident from the result, as well as accordant with the pilot's manner of testifying in relation to it. And if, as alleged, the Spartel's red light after her change could not be seen, it was the plain duty of the Vim either to starboard her wheel at once and go to port, or to stop until the Spartel, under her green light, had passed to the starboard bow of the Vim, or else to back, if necessary, as required by

rule 21. *The Vicksburg,* 7 Blatchf. 216; *The Northern Indiana,* 3 Blatchf. 92, 108; *The Governor,* 1 Cliff. 93. The case as stated by the captain and pilot of the Vim can scarcely exonerate them in this respect; for, if the Spartel, being two points to port, as they testify, changed her course when only an eighth of a mile distant so as to shut in her red and show her green light, then the danger of collision was obviously so imminent, and the precise course of the Spartel was so uncertain, that it would have been the duty of the Vim to stop and back at once instead of waiting until after two or three signals of the whistle had been given, apparently to induce the schooner to resume her former course. The other testimony, however, will not admit, as above observed, of the correctness of this alleged bearing of the Spartel two points to port at the time she changed her course.

I think the pilot of the Vim is in error in stating that the several whistles were sounded before the Spartel's change of course. No reason appears for any such whistles at that time; the captain puts them after her change, and none were heard on the Spartel till about the distance the captain states of one-eighth of a mile away. Nor can the pilot's testimony be credited that they hauled up on a course of N. E. by E. after passing Stepping Stones, and so kept about three-quarters of an hour. On that course the Vim would have run upon Hewlitt's point or Gangway ledge. In that location it is not possible, except by going zigzag, to deviate much from the regular course of about N. E., and there is no reason to suppose that the Vim followed any other course till after she had passed Gangway ledge half a mile before the collision.

The whole evidence taken together shows, I think, that though the Spartel wrongfully changed her course when within a mile of the Vim, yet the latter, having still abundant time and space to keep out of the way by a further change in her own course, did not take any such prompt or decisive measures to do so as were perfectly within her power; but that she still proceeded nearly upon her former course until the Spartel was near at hand, and then sounded whistles of alarm, and depended, apparently, in part upon the Spartel's luffing up, instead of herself assuming the whole duty of keeping out of the way, as required by law, and changing her own course promptly when this was made necessary by the faulty change of the Spartel. The previous fault of the Spartel did not relieve the Vim from this duty. The safety of life and property requires each vessel, no matter what the previous fault of the other, to use, with prompt-

ness and diligence and in accordance with the rules of navigation, all the means reasonably within her power to avoid collisions. *St. John* v. *Paine*, 10 How. 557, 584; *The Commerce*, 3 Wm. Rob. 288; *The C. C. Vanderbilt*, Abb. Adm. 361, 364; *The Scotia*, 14 Wall. 170, 181; *The Carroll*, 8 Wall. 302; *The American*, 22 Wm. Rob. 845, 848; *The City of Antwerp*, L. R. 2 Pr. C. 25, 30. In the case last cited Lord Westbury says: " It cannot be too much insisted on that it is the duty of a steamer, where there is risk of a collision, whatever may be the conduct of a sailing-vessel, to do everything in her power that can be done consistently with her own safety in order to avoid collision." The duty of the Vim to keep out of the way, so far as lay within her power, still remained, therefore, notwithstanding the Spartel's fault in changing her course. Had the Vim acted promptly and properly in view of this change, she would have been blameless though accident followed. For not doing so, she must be held responsible as well as the Spartel; and decrees should accordingly be entered for the libellant; in the first case, against both; and in the second case against the Vim for half the damages, with costs; and a reference to compute the damages.