BAKER, (BRONSON v.) See Case No. 1,605.

BAKER v. BROWNING. See Case No. 2,-041.

BAKER, (CARTER v.) See Case No. 2,472.

BAKER, (CHEW v.) See Case No. 2,663.

BAKER, (CHRIST v.) See Case No. 2,697.

=====

## Case No. 765.

BAKER et al. v. The CITY OF NEW YORK.

[1 Cliff. 75.] [1]

Circuit Court, D. Massachusetts. May Term, 1858. [2]

COLLISION—BETWEEN STEAM AND SAIL — FAULT—LIGHTS.

1. Steamers having more power and speed than sailing vessels, and being more immediately subject to control, greater caution and vigilance are expected of those in charge of them to avoid collisions.

[Cited in The Free State, Case No. 5,090.]

2. When a steamer and sailing vessel are approaching each other, the sailing vessel has, in general, a right to hold her course, and it is the duty of the steamer under such circumstances to adopt the necessary precautions to avoid a collision.

[Cited in The Free State, Case No. 5,090.]
[See The Carroll, 8 Wall. (75 U. S.) 302.]

3. The steamer is prima facie chargeable if she fails in this, and a collision occurs.

[Cited in The Sunnyside, Case No. 13,620.]

4. If the sailing vessel fails to keep her course, the fault will in general be attributable to her, provided it appears that under the unexpected change of course by the sailing vessel the steamer used all reasonable exertions to avoid the danger.

[Cited in The Sunnyside, Case No. 13,620; The Colorado v. The H. P. Bridge, 91 U. S. 699. The Coe F. Young, 1 C. C. A. 219, 49 Fed. 168.]
[See St. John v. Paine, 10 How. (51 U. S.) 557; The R. B. Forbes, Case No. 11,598; Haney v. The Louisiana, Id. 6,021; The Kentucky, Id. 7,716; Hall v. The Buffalo, Id. 5,927.]

5. These rules, however, cannot have any controlling application before the two vessels have approached to a point of danger, which renders their observance reasonably necessary.

6. No maritime usage requires merchant vessels constantly to carry lights.

7. Semble. If the absence of a light contributed to a collision in a harbor, or crowded thoroughfare, on a dark night, and one vessel showed a light and the other did not, it might

well be held that the dark vessel, other things being equal, was in fault.

[See The Adriatic, Case No. 91.]

[8. Cited in The City of Savannah, 41 Fed. 894, in support of the statement that on moonlight nights sailing vessels without lights can be seen two or three miles distant.]

In admiralty. Appeal from the district court, in a cause of maritime collision; Ware, District Judge, presiding. [Nowhere reported. Reversed.]

The allegations of the libel [by Judah Baker and others against the steamship City of New York] were in substance as follows: On the 15th of December, 1855, the schooner George Engs, having on board a cargo of corn, flour, and iron, sailed from Philadelphia on a voyage to Boston. At half past three o'clock on the morning of the 19th of the same month, when steering about east-southeast, she made a light off her weather bow, which proved to be on board the steamer City of New York, bound from Boston to Philadelphia. The weather was perfectly clear when the steamer was first discovered, being at a distance of about five miles from the schooner, coming out between Block island and Montauk point, and steering about southwest by south. The schooner kept off east, on her course for Block island, to give the steamer a wide berth. A short time afterward, when the steamer was nearly abreast the schooner, the mate of the schooner, who was at the helm, observing that the steamer was winding off towards him, immediately called all hands, and the master and mate both shouted to the steamer, which was four or five times her length to windward, to luff or hold her course so as to keep clear, which could then have been done. Immediately before the collision, the mate put up the helm of the schooner for the purpose of saving the lives of those on board. The schooner was struck by the steamer's bow, on her starboard and windward quarter, about ten feet from her taffrail, and sunk, with everything on board except the crew, in about fifteen minutes afterward. It was set up as matter of defence, that, after having made the steamer, the schooner changed her course and kept off more and more, until the collision occurred; also that the schooner showed no lights, and was not therefore discovered so soon by several minutes as she would have been had she conformed to the usual custom; that as soon as she was seen, the helm of the steamer was put to the starboard, to keep her off and give the schooner room, presuming she would keep her course; but shortly after, the schooner put off more from the wind, in consequence of which the danger of collision became apparent, upon which the engine was stopped and reversed, though too late to prevent the accident. The bows of the steamer struck the schooner near her main rigging.

C. W. Story, J. W. May, and B. R. Curtis, for libellants.

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

[2] [Reversing an unreported decree of the district court.]

Thaxter and Bartlett, for respondents.

CLIFFORD, Circuit Justice, (after reciting the substance of the pleadings). Many of the circumstances attending the collision are admitted, and others are so fully proved, that they cannot properly be regarded as the subjects of dispute. A collision occurred between the two vessels, and the schooner was sunk and totally lost, with all her cargo, consisting of corn, corn-meal, flour, and iron. She was a vessel of about one hundred and thirty tons burden, engaged in the coasting trade, and sailed from Philadelphia on the 15th of December, 1855, on a voyage to Boston, fully manned and equipped, and with a full cargo. On the 19th of the same month, at about half past three o'clock in the morning, when off the coast of Long island, in the usual track of vessels sailing between those ports, and about three or four miles south to southwest from Montauk point, she met the steamer City of New York, bound on a trip from Boston to Philadelphia, and the collision took place. Damages are claimed on the part of the schooner, on the ground that the collision is chargeable to the fault of the steamer, and the answer admits the collision and the loss, but denies that it was the fault of the steamer, and the respondents, as a matter of fact, insist that it was the fault of the schooner. It was a clear starlight night, but the moon had been down from a half-hour to an hour before the collision occurred. No light was shown on the schooner, but the steamer carried her usual lights, one forward and one on each quarter, and both the vessels had lookouts. It was the second mate's watch on board the schooner, from twelve o'clock at night to four in the morning, and he was at the wheel when the steamer was first discovered. At that time the steamer was about five miles distant, and the mate says the schooner was heading east by north, and that shortly afterward he put her off east for Block island. The wind was then not far from north, and about a six-knot breeze. When the master went below, at twelve o'clock, he says the wind was about north and was not quite steady, and that the schooner was then heading east-northeast. Reardon, the second mate of the steamer, says that the wind, at the time he first discovered the schooner, which was not until the vessels had approached within half a mile of each other, was north-northwest. These statements respecting the course of the wind are not conflicting, and lead to the conclusion that its bearing at the time of the collision was at least one point west of north. At the time the mate of the schooner first discovered the steamer, and when he changed her course from east by north to east, the course of the steamer was about southwest by south, and it is believed, from the evidence, that if she had kept that course a collision would not have occurred.

Allowing that the schooner was sailing five or six knots and the steamer about ten miles an hour, it is a reasonable calculation that they were approaching each other say at the rate of fifteen miles an hour, or one mile in four minutes. They were, therefore, about twenty minutes' sailing time apart when the schooner changed her course from east to north by east, and that change must have been made from fifteen to eighteen minutes before the schooner was discovered by any one on board the steamer. After that change was made, and before the schooner had been seen by the second mate of the steamer, the two vessels had advanced toward each other four and a half miles, which could not have been accomplished in much less than eighteen minutes at the rate of speed they were sailing. Assuming that the two vessels were approaching each other at the rate of a mile in four minutes, then the second mate of the steamer is mistaken in supposing that two minutes elapsed, after the engine was stopped, before the steamer struck the schooner, and his own testimony shows satisfactorily the error in his calculation. He admits that he gave the order to stop the engine, because he saw that the two vessels were coming together; and it was not until after he had noticed that the schooner had changed her course that he gave that order. When he first saw the schooner she was only about half a mile off, and that was before he had ordered the helm to be put hard a-starboard. What time elapsed after he ordered the helm to be put hard a-starboard, and before he gave the order to stop the engine, will appear most satisfactorily by a comparison of his testimony with what transpired on board the schooner at that precise time. She was approaching the steamer on a course of east by north, and the mate says he continued that course until the steamer was nearly abreast of the schooner, when the lights of the steamer suddenly changed, and he saw that she was coming down on to the schooner. Seeing that, he called all hands, and while the master was coming up from below he hove the wheel up. He says, however, at the same time, what it is important to notice, that the steamer struck the schooner before she could alter her course but very little, showing conclusively that the collision was inevitable irrespective of any change of course that was or could have been made. Before the master left the deck he directed the mate, or arriving near Montauk point, to steer east for Block island; and it is clearly proved that the change was made shortly after the steamer was first discovered, and that it was an order proper to be executed to carry the vessel on the usual route south of that island to Boston. In respect to the second change of course, it satisfactorily appears, both from the testimony of the second mate of the steamer and from the testimony of the mate of the schooner, who were in charge of their respective vessels,

that it was not made until all chance of preventing the collision was gone. It is admitted in the answer that this last change was made after the helm of the steamer had been put to the starboard, and so is the testimony of the second mate of the steamer, by whom the order to starboard the helm was given. Two seamen, also, who were on board the steamer, testify to the same effect. They say, in substance, that after the wheel of the steamer was put hard a-starboard, and she had begun to pay off, they noticed that the schooner had her wheel hard a-port, and that she also had begun to pay off. It is true, that the mate of the schooner, after he discovered that the collision was inevitable, hove the wheel up, and it may be that she had begun to pay off when the collision occurred; but it is fully proved that her course had not been altered enough to affect the result, except, perhaps, to shift the blow from one part of the schooner to another. When the mate called all hands, the master says he jumped on deck, and that the situation of the vessels at that time was such that it could have made no difference whether the schooner had luffed, wound off, or kept a straight course. Shockley, the engineer of the steamer, says that he received the order from the second mate to stop the engine just before the steamer actually came in collision with the schooner. He estimates the time that elapsed after the order and before the collision at about a minute, but says he had just time to close the throttle-valve, and that it was the only order he received, although, from the quick way in which it was given, he expected that the order to reverse would immediately follow, and accordingly unhooked the engine and threw her into the back motion. It was to the change of course last made on the part of the schooner that the second mate of the steamer referred in his testimony, when he said that, after he ordered the helm to be put hard a-starboard, he noticed the schooner had altered her course more to the eastward, and not to the change from east by north to east, which had been made twenty minutes before, when the two vessels were five miles apart. He was referring to a change of course which he himself had seen, and not to one made at least fifteen minutes before the schooner had been discovered by any one on board the steamer. After the mate of the schooner first discovered the steamer, two changes were made in the course of the schooner, and only two, as conclusively appears by a careful comparison of all the testimony in the case. One was made when the two vessels were about five miles apart, and at least fifteen minutes before any one on board the steamer had discovered the schooner, and the other not until the vessels were in such close proximity that a collision was inevitable; and throughout all the intermediate period the schooner held her course without any change

of the wheel whatever. Some change also was made in the course of the steamer after the second mate was informed by the lookout that a sail had been discovered on the starboard bow. How much change was made in the first instance does not appear; and the man at the wheel says that the first he knew of the matter was, that the second mate ordered the helm hard a-starboard, and that he executed the order as soon as it was received, leaving it to be inferred either that no previous order had been given, or, if given, that it had not been understood or obeyed. He had not seen the schooner when he executed that order, and when he did see her he says that she was heading towards the steamer, but omits to state what time had elapsed after the order was given before he saw her and the distance between the two vessels. His estimate that three minutes elapsed after the order was executed before the collision occurred is contrary to all the other evidence in the case, and therefore cannot be admitted to be correct. Howlett first discovered the schooner, and he says that he sang out twice to the second mate that there was a sail ahead, and he heard that officer singing out to the man in the wheel-house to put the helm a-starboard, and this was before the witness had ascertained the bearing of the schooner; and the second mate admits that he could not tell at that time which way the schooner was going, whether east-northeast or west-northwest, and yet he says he gave the order, and it was promptly executed, and it does not appear that it was countermanded before the collision. All these facts are so clearly proved, that it is difficult to see how they can be misunderstood. On this state of the evidence the respondents insist, in the first place, that the schooner was in fault, because she changed her course shortly after the mate of the schooner first discovered the steamer, and at the time when the two vessels were about five miles apart. That change did not exceed two points in any view of the evidence, and, according to the testimony of the mate, who had charge of the deck and made the change, it was but one point from east by north to east, and was one proper to be made to carry the vessel on her intended route south of Block island.

I. Steam vessels, having more power and speed than sailing vessels, and being more immediately subject to control, greater caution and vigilance are exacted of those in charge of them to avoid collisions. Consequently a sailing vessel, whether close-hauled or with a free wind, when a steamer is approaching, has in general a right to keep her course; and it is the duty of the steamer under such circumstances to adopt such precautions as to avoid a collision; and if she does not, and a collision occurs, the steamer is prima facie chargeable; and in order that the steamer may not be baffled in her pur-

pose to adopt such precautions, it is the duty of the sailing vessel to keep her course as though there was no danger; and if she fails to do so, the fault will, in general, be attributable to her, provided it also appears that the steamer used all reasonable exertions to avoid the danger under the unexpected change of course on the part of the sailing vessel. The St. John v. Paine, 10 How. [51 U. S.] 583; The Oregon v. Rocca, 18 How. [59 U. S.] 571; The Clement, [Case No. 2,879.] These rules of navigation ought to be strictly adhered to in all cases where they are applicable. They were prescribed to prevent collisions and for the ascertainment of the rights of parties, after they have occurred, in cases to which they apply. They cannot, however, have any controlling application before the two vessels have approached to a point of danger which brings them into exercise, and makes their observance reasonably necessary in order to fulfil the purpose which they were designed to accomplish. Accordingly it was held by the supreme court, in the case of The Monticello v. Mollison, 17 How. [58 U. S.] 154, that they did not apply in a case where the approaching vessels were seven miles apart, it appearing, as in this case, that the change of course on the part of the sailing vessel was made before she had been seen by the steamer; and in Newton v. Stebbins, 10 How. [51 U. S.] 606, the same court held that the sailing vessel was not in fault, although the distance between her and the steamer when she changed her course was only three or four miles, and the change of course had been made by her after she had been seen by the steamer. A change of course under such circumstances, if made into the pathway of the approaching steamer, could not be justified, unless it also appeared that the steamer was guilty of negligence in not avoiding the danger. The change made in this case, however, was not of that character; and there is no evidence having the least tendency to show that it had the effect to baffle any precaution which those on board the steamer adopted or intended to adopt. Both these suggestions are disproved, as fully appears from the evidence already stated. When that change was made, there was no danger of collision, and if the steamer had kept her course it would not have occurred; and inasmuch as it did not in any manner contribute to the disaster, it was not a fault on the part of the schooner. The Genesee Chief, 12 How. [53 U. S.] 461.

II. It is contended, in the second place, by the respondents, that the schooner was in fault because she changed her course after she was seen by those on board the steamer. When the schooner was first seen by the second mate of the steamer, the latter was sailing about ten miles an hour, and he says the schooner was about a half-mile off, and he admits that he ordered her helm put hard a-starboard just as quick as he could, and that

about two minutes elapsed before he gave the order to stop the engine; thus fully confirming the engineer, who says he received the order just before the steamer actually came in collision with the schooner. They were approaching each other at the rate of a mile in four minutes; and it appearing that they were but a half-mile apart when the order to starboard the helm was given, it shows to a demonstration that the speed of the steamer was not reduced until the instant of collision; and this confirms the testimony of the mate of the schooner, that she had not time after he hove up her wheel to make any considerable change in her course, and strongly corroborates the testimony of the master, that it would not have made any difference whether she had luffed, wound off, or kept a straight course, as the collision was then inevitable. Rules of navigation were designed to afford security to life and property on the high seas and other navigable waters, by preventing collisions, and cannot be invoked by those who have rendered their observance impracticable or imminently dangerous to human life. A change of course under such circumstances is not a fault, and certainly not when, as in this case, it appears that it did not contribute to the collision. The Birkenhead, 3 W. Rob. Adm. 76; The Rose, 2 W. Rob. Adm. 1; The James Watt, 2 W. Rob. Adm. 271.

III. It is insisted, lastly, by the respondents, that the schooner was in fault because she did not show any light prior to, and at the time of, the collision, and reference is made to a case decided in the third circuit to support that proposition. In that case the court expressed the opinion that sailing vessels navigating in harbors and thoroughfares in a dark night, where they are constantly liable to meet steamers, ought to show a light; and signified in strong terms, that between a vessel under such circumstances, with a light, and another without a light, other things being equal, they would hold the dark vessel to be in fault; admitting, however, at the same time, that there is no law requiring vessels navigating the high seas to carry signal-lights, and that courts of justice cannot establish any such rule, and make it obligatory on such vessels. Bark Delaware v. Steamer Osprey, [Case No. 3,-763.]

No maritime usage requires merchant vessels constantly to carry lights, and it is understood there is some difference of opinion among navigators as to its expediency, especially when navigating along the coast, where the lights on board vessels are liable to be mistaken for land lights, and thus by deceiving other vessels as to their own true position, bring them into danger. In harbors and crowded thoroughfares the balance of safety would seem to be in favor of showing a light. Such were the views of the district judge, and they are believed to be correct; and where that precaution is omitted

in such thoroughfares, on a dark night, and it appears that the absence of a light contributed to the collision, and that the colliding vessel showed a light and used all reasonable exertions to prevent the collision, it might well be held that the dark vessel, other things being equal, was in fault. That principle, however, cannot have any application to this case for several reasons apparent on an examination of the facts. Here the collision occurred on a clear starlight night, when several of the witnesses, who are experienced navigators, say that the schooner could have been seen two or three miles. Others say that a schooner in such a night might be seen a mile and a half or two miles, and some enlarge the distance three or four miles. Not a doubt is entertained that she might and ought to have been seen much earlier, if the lookouts on the steamer had been vigilant in the performance of their duty.

IV. Lookouts are valueless unless they are vigilantly employed on their duty; and whenever it appears that they are not so employed on board steamers, it must be considered as the fault of the steamer. Vessels propelled by steam have command of their own course and their own speed, and it is their duty, where there is room, to pass an approaching sailing vessel at such a distance as to avoid all danger; and if in consequence of the omission of duty on the part of lookouts, or their negligence, the approaching sailing vessel is not seen in season to prevent a collision, the fault is properly chargeable to the steamer, unless the sailing vessel was also guilty of a violation of the rules of navigation. The Genesee Chief, 12 How. [53 U. S.] 463. These reasons, together with those already mentioned responsive to the preceding propositions, lead necessarily to the conclusion that the collision was the fault of the steamer. Some evidence is exhibited in the case tending to show a local usage for sailing vessels to carry lights in the harbor of Boston. The effect of such a usage, if proved, it is not necessary now to consider, as the evidence introduced is not sufficient to show its existence. The decree of the district court [unreported] is therefore reversed, and a decree must be entered for the libellants.