## THE LEPANTO.

## THE CASSIE F. BRONSON.

## THE LEPANTO v. BENNETT et al.

## WISE v. THE CASSIE F. BRONSON.

*(Circuit Court of Appeals, Fourth Circuit. April 12, 1892.)*

1. **COLLISION—STEAM AND SAIL—LIGHTS.**
   A steamer moving at midnight in the open sea, on a course S. W. ⅓ W., and, approaching a schooner moving on a course N. E. by E., passes the point of intersection of courses just before the schooner reaches it, and, seeing the schooner's green light, puts her helm hard a-port, thereby producing a collision with the schooner, *held,* that the steamer was in fault.

2. **SAME—INTERNATIONAL RULES.**
   Section 4234, Rev. St. U. S., requiring sail-vessels to show torch-lights on the approach of steamers at night, does not apply, since the adoption of the international rules of navigation of 1885, to vessels upon the high seas or coast-waters.

3. **SAME—PARALLEL AND OBLIQUE COURSES.**
   A maneuver which would have been a proper one as to vessels approaching each other on parallel courses may be a fatal one if the vessels are moving on courses obliquely intersecting.

*(Syllabus by the Court.)*

Appeal from the Circuit Court of the United States for the District of Maryland.

In Admiralty.

*Foster & Thomson,* (*James Thomson,* of counsel,) for appellant.

*Robert H. Smith,* for appellees.

Before FULLER, Chief Justice, and HUGHES, District Judge.

### OPINION BY JUDGE HUGHES.

A collision occurred between the steamer Lepanto and the schooner C. F. Bronson, 25 miles south of Long island, in the Atlantic ocean, shortly after half-past 12 o'clock on the night of the 22d–23d April, 1890, from which the schooner sustained damages assessed at about $10,000, and the steamer damages claimed to the same amount. Libel was filed in behalf of the schooner, which was answered, and a cross-libel filed. The district court of Maryland decreed for the libelant, the circuit court affirmed that decree, and the case has been appealed to this court.

The collision occurred on a clear night; the deck officer of the steamer Lepanto described it as a "fine, very fine, starlight" night. Witnesses severally say that objects could be seen at 2, 3, 4, 5, and 6 miles distant. The Lepanto was running, half-laden, 10 to 11 miles an hour, on a course S. W. ¼ W., and was first seen by the schooner when at a distance of 5 or 6 miles. She registers 1,489 and carries 3,000 tons. Her dimensions are not given. The Bronson is a four-masted schooner of 183 feet keel, 40 feet beam, and 2,000 registered tonnage. She was laden with 1,789 tons of coal. She was on a course N. E. by E., with

all sails set, moving before a very light wind, blowing from S. S. W., at a speed of two and a half miles an hour, which barely gave her steerage-way. There being very little wind, her sails were "hauled out by the tackles on the port side;" were "way off on the port side;" were "drawing hardly enough to keep the booms off;" "requiring tackle to be hooked on to keep the booms off." Witnesses of the Lepanto all insist that they did not see the schooner, or her red light, until within half a mile from the place, and four minutes of the time, of the collision. The two vessels were approaching each other. The course of the steamer being S. W. ¼ W., and of the schooner N. E. by E., they were moving on intersecting lines, and the sequel proved that they were moving in such manner that the steamer would pass the intersecting point of the two courses before the schooner reached it. Before the collision the schooner had the steamer a point and a half on her port bow, the steamer conversely having the schooner a point on a half on her starboard bow. If their lights were in place and burning, the steamer showed her green light and the schooner her red light to the approaching vessel until the steamer crossed the course of the schooner. The steamer was bound by the seventeenth international rule of navigation, (1885,) which requires, in substance, that when a steam-ship and a sailing ship are approaching each other on intersecting courses the steam-ship shall keep out of the way of the sailing ship, and the schooner by the twenty-second rule, which required her to keep her course. If the schooner was not in fault as to her lights and her men on deck, and kept her course, then the presumption is that the steamer was in fault; her duty being to keep out of the way. The evidence of all the crew of the schooner in the case is so positive, clear, and consistent to the effect that her lights were in their proper places, and burning brightly, for hours before and at the time of the collision, that it would be unreasonable to entertain doubts of the fact.

In every case of collision between ships in which the testimony of one vessel is as unanimous and positive as it is in this, if it nevertheless be in fact false, there is sure to be some physical circumstance, condition of things, or occurrence developed in the evidence to refute and discredit the false testimony. This sort of refutation is wholly wanting in the present instance, and it must therefore be repeated that it would be unreasonable to doubt the fact that the regulation lights of the schooner were in their proper places, and burning brightly, before the collision. The matter of the flash-light is not included in this remark, and will be dealt with in the sequel.

It is true that those of the Lepanto's crew who were examined all say that they did not see the red light of the schooner until shortly before the collision; their testimony being as follows, respectively: The first officer says, "about three or four minutes before;" the third officer mentions no time, but first saw the red light "about one and a half points off our starboard bow; about half a mile, I should say, or a quarter of a mile, from us;" Howard, the lookout, says "two or three or four minutes, bearing a point and a half on the starboard bow;" and Kilby, the pilot, says,

"Saw a red light about a point and a half on the starboard bow, about three minutes before the collision."

It would be unreasonable to question the sincerity or truth of these statements. It must be conceded that the red light of the schooner, though in its place and burning, was not visible to these witnesses until shortly before the time, and within half a mile of the place, of collision; a fact which was doubtless due to the feebleness of the breeze, and the consequent slack condition of the sails of the schooner, hanging "way off" on the port side," obscuring the red light. As to the men on deck of the schooner at the time of the collision, the lookout was in his proper place, the first and third officers were on duty, and giving due attention to the navigation, and there was a pilot at the helm,—all competent men, none of whom were at fault in the discharge of their respective duties. Nor can it be doubted that the schooner kept her course. Moving so slowly before a light wind as barely to be in possession of steerage-way, this large four-masted schooner, fully laden, was incapable of changing her course, except in the slowest manner; and the testimony proves that she made no change of helm until just before the moment of collision, when it was put hard a-port, but with no other effect than to bring her bow to starboard about a quarter of a point. It follows from the foregoing considerations that the schooner was not in fault.

Was the Lepanto in fault? In order to simplify this inquiry, let two things be premised: *First.* If two vessels are approaching each other in the night on parallel courses, each passing to the right, and showing the other her left or port side and red light, and each keeping her course, they will certainly pass clear. But if one of the vessels, just as the other nears her, shuts in her red and shows her green light,—that is to say, throws herself across the bows of the other,—then a collision is inevitable if the two are in close proximity; and all that the other vessel can do is to put her helm hard a-port and throw her bow to starboard, in order to lighten the concussion as much as possible. *Second.* But if the two vessels are approaching each other in the night on courses that intersect at an oblique angle, in such manner that one vessel will reach the point of intersection before the other, the two will clear each other if each keeps its course. The vessel reaching the intersection first, if running S. W. ½ W., will see the other's red light, if the latter be moving N. E. by E., until just before crossing that vessel's course, but will see her green light immediately after crossing, and, if the crossing vessel then keeps on, there will be no casualty. But if this vessel, unmindful of the fact that the two courses intersect, after crossing the other's course, and on seeing the green light, puts her helm hard a-port, as if she were passing the other on parallel lines, then, if she is very near the other vessel, a collision becomes imminent. See the annexed diagram.

The evidence in this record adduced in behalf of the Lepanto, although very indefinite and confusing on the vital point of the case, seems to leave no doubt that the second statement describes what occurred. The Lepanto, immediately on crossing the Bronson's course, and on seeing that vessel's green light, committed the blunder of putting her helm

hard a-port, thus throwing her bow rapidly to starboard against the schooner, which she had actually, though unconsciously, cleared. This maneuver of the Lepanto would have been the proper one if the two vessels had been nearing each other on parallel lines, for in that case the sight of the schooner's green light would have been the announce-

N.

W. ——————— E.

S.

Streamer's course

N.E. by E.

A

Schooner's course

B
B

A

S.W.¼S.

NOTE.

A.A. - Positions before collision.
B.B. - Positions at the collision.

ment of an imminent collision. But they were not passing on parallel lines; the Lepanto had crossed the bows of the Bronson on an intersecting course, and the sight of that vessel's green light was the signal that she had crossed in safety. If she had then continued on her course, nothing would have happened, but, on seeing the schooner's green light, and losing sight or in ignorance of the fact that he was on an intersect-

ing course, her navigator made the maneuver which was fatal in that condition of things, though it would have been proper if he had not crossed the course of the schooner.

It is true that the witnesses for the Lepanto insist that, while she still had the schooner a point and a half on her starboard bow, and was a quarter to a half mile off, and immediately on seeing the schooner's red light, and several minutes before that vessel's green light appeared, she made the maneuver of putting her helm hard a-port. But the Lepanto's testimony on these points cannot overcome a stubborn physical fact. A close examination of that testimony on the crucial point of the time of putting her helm a-port itself leaves the impression, notwithstanding the language of the witnesses to the contrary, that the steamer had crossed the schooner's course, and that the green light had shown itself, when the helm was put to port. But such an examination in unnecessary here, because a collision would have been physically impossible if the helm had been put hard down, as described by the steamer's witnesses, "three to four minutes" before the collision, when the steamer was at a distance of "a quarter to a half mile" from the schooner, and still had her "a point and a half on her starboard bow." The steamer's pilot testifies, with apparent pride, that she "obeyed her helm readily,—very quickly;" and the proposition must be absolutely rejected that a steamer thus exceptionally responsive to her wheel failed, with her helm hard a-port, to clear a vessel on her starboard bow, more than a quarter of a mile, and three or four minutes, off.

Given the position of a slowly moving schooner on the starboard of a steamer; given the facts that a half-laden steamer, readily and quickly obedient to her wheel, moving 10 miles an hour, puts her helm hard down, and, coming around, strikes the schooner with her port side,— on these premises the conclusion is irresistible that this steamer was in very close proximity to the schooner when she put her helm hard down. In the matter of the Lepanto, the conclusion is irresistible that the schooner's green light had shown itself when the steamer's helm was put to port. The collision could not have occurred if the helm had not been put down after the schooner's course had been crossed, and the steamer was in fault in putting it hard to port after that crossing, and doubtless after the schooner's green light was shown.

It is insisted, however, on behalf of the Lepanto, that her failure to discover the relative situations of the two vessels was largely owing to the fault of those on the schooner in not showing a flash-light, as required by section 4234 of the Revised Statutes. It is answered, on the schooner's behalf, that in point of fact she was prepared to exhibit a flash-light, and did actually ignite it, but put it out immediately after doing so on seeing the green light of the steamer, which gave assurance that that vessel was about to cross her course and go clear.

It is needless to deal here with this issue of fact. The international rules of navigation, enacted into laws by the act of congress of March 3, 1885, do not require flash-lights to be used by vessels upon the high seas and coast-waters of the United States. Article 2 of those rules de-

clares that no other lights than those mentioned in the articles of the act relating to lights shall be carried, and none of those articles mention flash-lights; and section 2 of the act repeals all laws and parts of laws inconsistent with those articles. Moreover, the act of 1885, establishing international rules for sea-going and coasting vessels, omits section 4234 of the Revised Statutes. It follows, therefore, that if the schooner Bronson did not display a flash-light on the approach of the Lepanto, she was not in fault on that score. The decree of the circuit court is affirmed, with interest, and costs of the appeal to be paid by appellant.