BRIGHAM et al. v. LUCKENBACH et al.

(District Court, D. Maine.   August 30, 1905.)

No. 44.

1. COLLISION—STEAM AND SAILING VESSEL AT NIGHT—DUTY OF STEAM VESSEL TO KEEP VIGILANT LOOKOUT.

It is the duty of a tug, navigating in the nighttime in a place frequented by all kinds of vessels, to have the highest degree of vigilance and care on the part of her lookout, who should be stationed in the very best place possible for seeing and hearing, where he cannot be interfered with by conversation, and sufficiently near the stem to enable him to see objects lying low in the water; and the absence of a lookout so stationed, and exercising such vigilance and care, is prima facie evidence that the tug was in fault for a collision with a sailing vessel, which should have been seen in time to have been avoided.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 140–146.]

2. SAME—UNAVOIDABLE ACCIDENT.

The fact that a tug's wheel jammed and prevented the changing of her course in time to avoid collision with a crossing schooner was not an unavoidable accident which will exonerate the tug from fault, where the jamming was the result of the suddenness with which the wheel was turned, which would not have been necessary if the schooner had been seen when she should have been, if the tug had kept a proper lookout.

3. SAME—LIGHTS—CONFLICTING EVIDENCE CONSIDERED.

The testimony of men engaged in navigating a schooner, which was sunk by collision with a tug at night, that the schooner's side lights were burning, is not weakened by the fact that they also testify that they looked at the lights after the tug was seen approaching, such act being a natural one with careful navigators; and their positive testimony to the fact will outweigh the negative testimony of those navigating the tug that they did not see the schooner's lights, especially where their position on the tug was not a favorable one for the purpose.

4. SAME—VESSELS CROSSING—FLARE-UP LIGHT.

A schooner cannot be charged with fault because she did not show a flare-up light to a steamer approaching from forward of her beam, but such action would, on the contrary, have been a fault.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 114. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

5. SAME—TUG AND SCHOONER—DUTY OF SCHOONER TO KEEP HER COURSE.

A schooner which was sailing close-hauled, and was privileged over a tug approaching on a crossing course, will not be held in fault for a collision, because she kept her course as required by the rules, unless it clearly appears that there were special circumstances which required a change of course.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 48.]

6. SAME.

A collision at sea in the night, a few miles out from the harbor of Portland, Me., between a tug leaving that port and a crossing schooner, held to have been due solely to the fault of the tug, by reason of her failure to see the schooner in time, through inattention and lack of vigilance on the part of her lookout. The schooner held to have been without fault.

In Admiralty. Suit for collision.

Benjamin Thompson, for libelants.

Peter S. Carter, for respondents.

HALE, District Judge. This case arises from a collision which occurred on the 16th day of November, 1904, at half past 9 o'clock in the evening, about three miles south by west from Cape Elizabeth lightship, between the libelants' schooner, Vidia M. Brigham, and the respondents' steam tug, Walter A. Luckenbach. .

The steam tug is 134½ feet in length, 26 feet beam, 16²/₁₀ feet deep, 295 tons net tonnage, and of 900 horse power. She is employed by the respondents in towing on the Atlantic coast. She left her dock in Portland at about 8 o'clock in the evening of the collision, bound for Providence, and was making from 9 to 15 knots. Capt. Daly, her master, was in the pilot house in charge. From the time she left her dock up to the time of passing the Cape Elizabeth lightship, he was also performing the duties of lookout. Nelson Farrow was engaged in caring for the dock lines and putting them below, until the tug reached a point near the Cape Elizabeth lightship, when he entered the pilot house and was acting as lookout, standing at the fore window on the port side. The steam tug's course, from the time she left Portland Harbor up to the time of passing the lightship, was southeast by south. At that point she changed her course to S. ¾ W., and continued on that course until about the time of the collision. Neither the captain nor the lookout observed any light, or the sails of any vessel, until the upper part of the sails of the schooner loomed up under the steam tug's bow. They did not at that time see the jibs of the schooner, nor any lights upon her. When the sails of the Brigham were first seen, the bells to stop and full speed astern were immediately given and obeyed in the engine room. Capt. Daly attempted to put the wheel hard aport, but, owing to the quick movement of the wheel, the steam steering gear became jammed, and before the tug's course could be very much changed the vessels came together.

The schooner was a fishing vessel 97 feet long, 20 feet and 8 inches beam, 9 feet and 8 inches deep, and of about 53 tons net tonnage. She was on a voyage from Gloucester, Mass., to Boothbay Harbor, Me., and was proceeding, under her four lower sails, close-hauled, on the port tack, full and by, making about 9 knots. Her course was about E. by N. to E. N. E. She had two men on deck—John Daly at the wheel, and Everard W. Doughty forward on the lookout. While she was thus proceeding, about 9 o'clock, the watch on deck observed a steamer, which proved to be the steam tug coming out of Portland Harbor on a southeasterly course. This fact was noted by the two men on the schooner's deck. After the tug passed the Cape Elizabeth lightship, she was observed to swing to the south. Her green light and mast headlight were seen by those on the schooner's deck, and continued to be seen until she was a short distance away from the schooner, when the tug was observed to swing to starboard, so that both lights were visible. Very soon after she struck the schooner on the port side about 10 feet forward of her stern, cutting the stern completely off. The port side of the schooner swung alongside of the steam tug. The schooner sank a few minutes after the collision; the crew having barely time to get out their dories and row to the tug. All of the crew of the schooner were rescued, with the exception of Daly, the wheelsman, who was drowned.

This libel in personam is brought by the master, in behalf of the owners and crew of the schooner, to recover damages for the loss of the schooner, her outfits and stores, and the personal effects of the crew.

1. The principal fault alleged against the tug is that she did not have a proper lookout, and for that reason did not discover the schooner in season to keep clear of her.

The night was cloudy. The moon set about midnight. There is much conflict of testimony as to how dark it was, and as to how far the sails of a vessel could be seen. The testimony offered by the libelants tends to show that lights could be seen a mile and a half away, and that the sails of a schooner like the Brigham could be seen from half a mile to a mile. On the other hand, the evidence of those on the deck of the tug is that the night was dark, cloudy, and gray, a "phosphorous night," when objects lying low in the water could not be seen by an approaching vessel until within a very few feet. The tug changed her course at the lightship, and from that point was heading S. ¾ W. The schooner's course was E. by N. to E. N. E. The tug, then, as she approached, could not have been more than three points forward of the schooner's beam. The vessels were therefore approaching each other approximately at right angles. The schooner had two masts, and presented the surface, and not the edges, of nearly new, white sails to the view of the tug. The testimony of the keeper of the lightship, and of other unprejudiced witnesses, leads me to the belief that such sails could have been seen by a vigilant lookout in season to have avoided the collision. Up to the lightship, the captain alone was performing the duties of lookout, as well as the duties of wheelsman. When near the lightship, Farrow came into the pilot house and

undertook to perform the duties of lookout, standing at the fore window on the port side. The tug was going out of Portland Harbor in the path of commerce, a place frequented by vessels of all kinds. She was under the duty, then, to have a lookout stationed at a point best suited for the purpose of hearing and seeing the approach of objects likely to be brought into collision. The United States Circuit Court of Appeals for the Fourth Circuit, in The Vedamore, 137 Fed. 844, holds that a lookout should be placed in the bow of the ship; that the bow is the best position from which to hear sounds and observe objects; and that it will not avail a ship, which is bound to properly place her lookout, to show that its deck was so overcrowded that proper room could not be reserved for stationing a lookout. Judge Waddill, in speaking for the court, refers to The Michigan, 63 Fed. 280, 288, 11 C. C. A. 187, in which Judge Hughes used the following language.

"It was a flagrant fault in The Michigan that on the occasion of this collision she had no lookout in her bow, close up to her stem, in position to look over the point of the vessel on each side, and to discover in good time vessels that might be ahead of her in her course."

In The New York, 175 U. S. 204, 20 Sup. Ct. 73, 44 L. Ed. 126, the court said:

"Her officers failed conspicuously to see what they ought to have seen and to hear what they ought to have heard. This, unexplained, is conclusive evidence of a defective lookout."

In The George W. Childs (D. C.) 67 Fed. 269, the court said:

"The night was favorable to seeing. The schooner's sail was new and bright in color, and I am convinced that she was not seen earlier, only because of the tug's neglect to maintain a proper lookout. The statement that it is not customary for tugs to maintain a more vigilant lookout than this tug had is immaterial. The law determines their duty in this respect, and they cannot avoid it without becoming responsible for the consequences. * * * While I believe it to be clear that a proper lookout would have discovered the sloop in time to keep off, it is not necessary that this fact shall affirmatively appear, except as a result of the inference stated."

In The Patria ( D. C.) 92 Fed. 411, Judge Addison Brown held a steamer in fault for not having a lookout stationed forward at the bow, and held that, if on account of any weather conditions it was desirable to have a lookout as high above the deck as possible, this would not be a justification for the omission to keep a good lookout at the bow.

In The Genesee Chief, 12 How. 463, 13 L. Ed. 1058, the court said:

"It is the duty of every steamboat, traversing waters where sailing vessels are often met with, to have a trustworthy and constant lookout besides the helmsman. * * * And whenever a collision happens with a sailing vessel, and it appears that there was no other lookout on board the steamboat but the helmsman, or that such lookout was not stationed in a proper place, or not actually and vigilantly employed in his duty, it must be regarded as prima facie evidence that it was occasioned by her fault."

In The George M. Dallas, Fed. Cas. No. 5,338, the District Court held that the steamer was in fault for not having a competent lookout stationed in the forward part of the boat, whose duty it was to descry

and report to the proper officer vessels approaching at the earliest possible moment. Nelson, Circuit Justice, on appeal said:

"She [the steamer] had no lookout, in the maritime sense of that term. The pilot and captain were in the pilot house, which was some 50 feet from the stem of the vessel."

In The Ottawa, 3 Wall. 268, 273, 18 L. Ed. 165, 167, the court said:

"Steamers are required to have constant and vigilant outlooks stationed in proper places on the vessel. * * * Proper lookouts are competent persons other than the master and helmsman, properly stationed for that purpose on the forward part of the vessel; * * * and, in general, elevated positions, such as the hurricane deck, are not so favorable situations as those more usually selected on the forward part of the vessel, nearer the stem. Persons stationed on the forward deck are nearer the water line, and consequently are less likely to overlook small vessels, deeply laden, and more readily ascertain their exact course and movements."

In St. John v. Paine, 10 How. 557, 13 L. Ed. 537, the court said:

"We are also satisfied that the steamboat was in fault in not keeping at the time a proper lookout on the forward part of the deck, and that the failure to descry a schooner at a greater distance than half a mile ahead is attributable to this neglect. The pilot house in the night, especially if dark, and the view obscured by clouds in the distance, was not the proper place, whether the windows were up or down. The view of the lookout stationed there must necessarily have been partially obstructed. A competent and vigilant lookout stationed at the forward part of the vessel, and in the position best adapted to descry vessels approaching at the earliest moment, is indispensable to ex- empt the steamboat from blame in case of accident in the nighttime, while navigating waters on which it is accustomed to meet other water craft." The Caro (D. C.) 23 Fed. 734; Haney v. Packet Company, 23 How. 287, 16 L. Ed. 562; The Northern Indiana, 3 Blatchf. 92, Fed. Cas. No. 10,320; The City of Philadelphia v. Gavagnin, 62 Fed. 617, 10 C. C. A. 552.

In the case at bar the steamer was navigating in the nighttime in a place frequented by all kinds of vessels. At such a time and place the highest degree of vigilance and care must be expected from the lookout. While it is impossible to lay down the specific rule that the pilot house of a tug is always an unsuitable place for a lookout, I must come to the conclusion that in the nighttime, in the path of commerce, a tug should have her lookout stationed in the very best place possible for seeing and hearing, in a position where he cannot be interfered with by conversation, and sufficiently near the stem to enable him to see objects lying low in the water. I am constrained by the proofs to believe that the tug should have seen the schooner in time to keep clear of her. The fact that she did not see her is sufficient, in my opinion, to impute negligence upon the part of the lookout. I will not undertake to decide whether he was prevented from seeing her by his location in the pilot house, or by his inattention and lack of vigilance. From the cases to which I have referred, it will be seen that the courts have generally held that a point nearer the stem of a vessel is a more approved place for a lookout to be stationed, and that the fact that there were davits or other tackle on the forward part of the tug cannot be an excuse for locating a lookout in a place less adapted to his purposes; but, in whatever position he was stationed, he was charged with knowledge that his steamer was sailing in the nighttime in the path of vessels, and that the time and place call for a high degree of

attention and vigilance on his part. I do not, however, hold that it was in itself negligence to station the lookout in the pilot house in a tug of the size and character of the Luckenbach, even in the night-time and when going out of Portland Harbor; but I am constrained to hold that, being in the pilot house, and not further forward upon the vessel, an extraordinary degree of care was required of a lookout so stationed. I am of the opinion that the collision occurred from the inattention and lack of vigilance of the person who was undertaking to perform the duty of lookout on the part of the steam tug. I am of the opinion that the lookout was not in full and faithful performance of his duty at the time of the collision; that, if he had been faithfully performing his duty, he would have seen the schooner in time to avoid the collision. I am, then, of the opinion that the collision was occasion-ed by the fault of the tug.

2. It is urged, also, that the tug's steering gear became jammed, thus preventing her from avoiding the schooner; and that this was an unavoidable accident on the part of the tug, for which she is not re-sponsible. Capt. Daly, the master of the tug, says that, if he had seen the schooner in time to have rolled the wheel back when it jammed, there would have been no difficulty: that the jamming of the wheel was due to the suddenness with which it was rolled to port. Farrow, the lookout, says that, if the schooner had been seen a little sooner, there would have been no difficulty in going under her stern; that they would have had time to port their wheel more slowly, and so to obviate jamming it. If, therefore, there had been a vigilant lookout aboard the tug, the schooner would have been sighted seasonably, and there would have been no jamming of the wheel.

In The Surf (D. C.) 132 Fed. 880, a very recent case in the New York District, Judge Adams held that it is not unavoidable accident, but negligence, where a master proceeds carelessly on a voyage, and afterwards circumstances arise when it is too late for him to do what is right and proper to be done.

In the case at bar the defense of unavoidable accident cannot, in my opinion, be successfully urged by the tug.

3. The respondents accuse the schooner of fault, in that she did not have proper side lights set and brightly burning at the time of the tug's approach.

Upon this point there is the distinct, affirmative evidence of those up-on the deck of the schooner that the lights were lighted and burning at the time of the collision. When the tug was first seen, Doughty, the lookout, says that he had a conversation with Daly, the wheelsman, as to the steamer coming in sight, and that after such conversation he remembers looking again at the schooner's lights. He says he look-ed at the lights three times as the steamer was approaching, and that the lights were burning brightly; that the man at the wheel said to him, when the steamer was approaching, "Are the lights burning?" and he replied, "Yes, sir." He says that the reason for the wheelsman asking about the lights was because he saw the steamboat coming down, and she was quite well down toward the schooner and heading for-ward of the beam, and was at that time from half to three-quarters of a

mile away, and that there was nothing on the port side of the schooner which would in any way hide the port light; all the sails being on the starboard side.

In The Alice B. Phillips, 81 Fed. 415, 416, 26 C. C. A. 467, the court said:

"The testimony of those on board the schooner is harmonious, positive, and credible, and is distinctly to the effect not only that the light in question was actually burning, but also that it was bright; and we cannot agree that, because it has been testified that some—perhaps all—of these witnesses specially looked at the light and observed its condition when the steamer was perceived to be approaching, we should regard their statements with suspicion. On the contrary, we think this was a perfectly natural thing for them to do under the circumstances, and that the fact that they did do it makes their testimony all the more certain and reliable."

So, also, in the case at bar, the fact that the lookout on the schooner saw an approaching steamer, and at once looked to see if his own vessel's lights were in such condition that the steamer could see them, seems to me to be a circumstance in favor of the schooner. It seems to me to be the natural act of a careful man, and to make his testimony all the more valuable. Against the positive, distinct testimony of men aboard the schooner, who swear that they saw the lights burning brightly both before and after the collision, we have the testimony of the men on the deck of the tug. Much stress is laid upon the testimony of Capt. Daly and Farrow that, when close to the schooner, they saw no lights; but it will be seen from their own testimony that they were not in a position at the time of the discovery of the schooner to see her lights, but to see only the upper part of the sails. Their location in the pilot house, raised above the deck of the tug, was such that they would not have been likely at that time to see the side lights of the schooner. In regard to the testimony of the men upon the tug, it must be said, too, that it is at best negative. In reference to such testimony, Judge Waddill, in The Richmond (D. C.) 114 Fed. 208, 211, says:

"This positive testimony by those on the schooner, in a position to see the lights and know of their condition, will not be lightly rejected because other persons, whose duty it was to have seen them, either failed to observe or happened not to see them. Negative evidence of this character cannot be accepted to outweigh positive evidence. The failure to observe a light cannot be said to disprove its existence. * * * The court should be slow to hold that the officers and crew of a vessel were navigating the same without lights, as by so doing they were imperiling, not only the ship and its cargo, but their own lives. * * * A most significant circumstance bearing upon the vessel's lights is the fact that, although the failure of the vessel in this regard is made the chief basis of the steamer's defense, the fact that such lights did not exist was not made record of at the time of the collision, either in the steamer's log or the protest made the next day. Both the log and the protest utterly fail to make any reference to such conditions, and it is hard to believe that so important an omission would have been made, had the lights not been burning. Although the hull and spars of a vessel could be seen a half a mile away, he [lookout] neither saw the vessel in collision with his ship, nor its lights, until they were within 300 feet of each other, and then not until his attention was called by the screams of persons aboard of the schooner, when, without reporting the schooner, he immediately left his station. Had this lookout been competent or in the proper discharge of his duty, the schooner could easily have been seen and reported, with or without lights, according to his own

statement, in time to avoid the collision. Indeed, although the lookout could have seen the schooner's lights two miles away, and the vessel itself a half mile away, he admits that he saw neither, until his attention was attracted by the screams of those on the vessel. This is equivalent to a confession of his own negligence."

See, also, The Alabama (D. C.) 114 Fed. 214.

In The Pavonia (C. C.) 26 Fed. 106, Judge Wallace held that, when there was no obstacle in the way, the fact that an approaching vessel is not seen is all that is necessary to impute negligence on the part of the lookout.

After carefully examining the proof in the case, the court comes to the conclusion that at the time of the approach of the steamer, and up to the time of the collision, the schooner's lights were properly set and burning; that the failure on the part of the tug to see those lights was due to the want of a vigilant and efficient lookout.

4. The respondents further accuse the schooner, because she did not show a flare-up light to the steamer.

Article 10 of the sailing rules provides:

"A vessel which is being overtaken by another shall show from her stern to such last-mentioned vessel a white light or a flare-up light."

The steamer's course was changed at the lightship to S. ¾ W. At that time the vessels must have been more than three miles distant. As the schooner's course was from E. by N. to E. N. E., it is perfectly clear to me that the schooner was not being overtaken, within the meaning of article 10. Doughty says that the steamer was approaching from three points forward of the beam, and that "she was always approaching from forward of the beam."

There is no testimony to induce me to believe that this was a wrong conclusion. It has been repeatedly held that the showing of a flare-up light to a steamer approaching from forward of the beam is a fault. In The Algiers (D. C.) 38 Fed. 526, it will be seen that the courses of the colliding vessels were almost the same as those on which the tug and the schooner were sailing at the time they came together in the case at bar.

In that case Judge Benedict held that it was a fault for a schooner to display a flare-up light to an approaching vessel, except when she was being overtaken by such vessel. He found the schooner at fault for exhibiting a flare-up light to the steamer approaching forward of the beam. See, also, The Lepanto, 50 Fed. 234, 1 C. C. A. 503. In the case at bar, when the men on the schooner saw the steamer approaching, they had a right to suppose that the steamer had the schooner in view. They had a right to suppose, also, that she was approaching from forward of the beam; and the evidence tends to show that such was the fact. Under these circumstances it would have been a fault for the schooner to have exhibited a flare-up light to the steamer. But it is contended that, when the steamer was very close to the schooner, then, under article 12, the schooner should have shown a flare-up light to the steamer, to attract her attention. The tendency of the courts is to hold that the exhibition of irregular lights by a vessel to an

approaching vessel is attended with great danger; as such action might tend to very greatly mislead.

In The Robert Graham Dun and The Excelsior (D. C.) 102 Fed. 652, it was held that a schooner cannot be held in fault for a collision with a steamer in the night, because of her failure to exhibit a flare-up light, where her other lights were burning brightly, and no necessity appeared therefor, until after the time she was discovered by the steamship. At page 656 the court says:

"The final question arises, by whose fault had the steamer been brought into that situation? For a long distance away the steamer's lights had been observed by those on the schooner, and no reasonable excuse is offered for the failure of those on the steamer to discover the lights of the schooner, until the vessels were near together. The lights were there, they were burning, and it is believed that they were not obscured."

In The Furnessia (D. C.) 137 Fed. 955, the schooner was accused because she exhibited a flare-up light, and the court found that the exhibition of this irregular light presented a difficult question. The court, however, excused the schooner on the ground that the collision was fully accounted for by the plain faults of the steamship. In the case at bar, after it became evident to the schooner that the steamer did not have the schooner in view, it was too late to show any flare-up light. Up to that time there was no special cause creating a necessity for a departure from the general rule in order to avoid the danger, such as is alluded to by Judge Putnam, in The Dimock, 77 Fed. 226, 230, 23 C. C. A. 123. This is not one of the extreme cases spoken of by Judge Putnam when a departure from the general rule is rendered necessary to avoid an impending peril. See, also, The Oregon, 158 U.S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943; The Maggie J. Smith, 123 U. S. 354, 8 Sup. Ct. 159, 31 L. Ed. 175.

From all the testimony, I am constrained to decide that the schooner was not in fault in failing to show a flare-up light to the steamer at any time during her approach, or at the time when the vessels came together.

5. The respondents further accuse the schooner of fault, because she held her course on the steamer's approach.

Article 21 of the International Rules provides:

"Where, by any of these rules, one of two vessels is to keep out of the way, the other shall keep her course and speed."

The note under this rule is:

"When, in consequence of thick weather or other causes, such vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision."

Article 27 provides:

"In obeying and construing these rules, due regard shall be had to all dangers of navigation and collision, and to any special circumstances which

may render a departure from the above rules necessary in order to avoid immediate danger."

Article 29 provides:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

It is urged with great insistence by the respondents that the testimony in this case shows that, under article 27 and the note under article 21, it was clearly the duty of the schooner to change her course when she saw the steamer approaching; that, while the steamer was upon her first course, and, even after she had changed her course at the lightship, it was the duty of the schooner to put her wheel up and go off on a course parallel with the steamer, letting the steamer draw away from her.

Doughty, the lookout upon the schooner, says that he saw the steamer when she was about a quarter or a third of the way from the Portland Light to the Cape Elizabeth lightship; that she was heading out to the southward and eastward; that later, and after she got by the lightship, she kept more to the south, and was afterwards apparently heading directly south. When she was a mile and a half or two miles away, he asked Daly, the man at the wheel, if he saw the steamer coming, and Daly replied, "Yes, she's coming down pretty close to us." And Doughty then said, "I guess she will go by the bow." Daly replied that he thought she would go under the schooner's stern. He further testifies that the steamer continued to show her green light until in close quarters with the schooner, when both lights were visible. She was approaching forward of the beam, and he thought that, though she was in close quarters, she would go by the schooner's stern. He remained at his post, and Daly did not leave the wheel. When the steamer was 350 or 400 feet away, bearing forward of the beam, the man at the wheel asked Doughty if it was best "to shift her course," to which Doughty replied: "No, for pity's sake hold your course. If you don't, she'll run us down." Doughty says that it was a clear night, and that the steamer could see the schooner's lights, and that they thought the steamer would go under the schooner's stern; that he thought that they did not have any right to ease their sheet and run before the wind as they were full and by, and the steamer was supposed to keep out of their way.

In The Patria (D. C.) 92 Fed. 411, 415, Judge Addison Brown, in speaking of the great reluctance which the courts have to finding a vessel in fault for keeping her course, as respects a steamer which is bound to keep out of the way, refers to the rule given in Haight v. Bird (D. C.) 26 Fed. 541, where the court says:

"No exception to the general rule that a sailing vessel must keep her course can, however, be allowed, except where it is entirely clear, not only that by changing her course she would in fact have avoided the collision, but that under the circumstances of the moment, as they appeared to the sailing vessel, escape by that means was so easy and obvious to a person of ordinary nautical judgment that it was clear negligence to omit it."

In Baker v. City of· New York, 1 Cliff. 75, Fed. Cas. No. 765, it was held that, when a steamer and sailing vessel are approaching each other, the sailing vessel has in general the right to hold her course, and that it is the duty of the steamer to adopt necessary precautions to avoid collision. Mr. Justice Clifford said:

"In order that the steamer may not be baffled in her purpose to adopt such precautions, it is the duty of the sailing vessel to keep her course as though there was no danger; and, if she fails to do so, the fault will, in general, be attributable to her, provided it also appears that the steamer used all reasonable exertions to avoid the danger under the unexpected change of course on the part of the· sailing vessel."

In The Gate City (D. C.) 90 Fed. 314, it was held that the rule requiring a sailing vessel, meeting a steamer, to hold her course, is a broad and general one, intended to put the burden of fault, in case of collision, on the steamer, and that, if the sailing vessel departs from the injunction, the burden is on her to show some reasonable excuse; that she must hold her course, even though the steamer seems to be maneuvering in an uncertain and dangerous way. That case arose in 1897, when the legislation of Congress touching sailing rules was substantially as it is now. In·The Illinois, 103 U. S. 298, 26 L. Ed. 562, the Supreme Court held that the duty of a sailing vessel was to keep her course, in order not to embarrass a steamer, while passing, by any new movements.

In The Emma Kate Ross (D. C.) 41 Fed. 826, 828, Judge Green said:

"A vessel, whose duty it is to keep her course, should not anticipate the movements of the other vessel and give way. The safety of navigation depends essentially upon the certainty which results from exact adhesion to general and well-known regulations."

In McWilliams v. Vim (D. C.) 12 Fed. 906, Judge Brown said:

"If the vessel bound to keep her course might lawfully change it at some indefinite point within these limits after the other's lights have become visible, except for special reasons under rule 24, then the other vessel, though bound to keep out of the way, could not, until that point were passed, shape her own course at all, except at the risk of being thwarted in her efforts to keep clear; and thus hesitation, uncertainty, and conflicting changes in navigation would be continued indefinitely within the limits of two miles, instead of that fixedness and certainty of action being secured, which is the evident object of the rules."

In reference to the two-mile limit, Judge Brown explains that the distance of two miles, which is the distance at which lights must be made visible, is also, by necessary implication, to be taken as the distance within which vessels should be required to keep their course. The Queen Elizabeth, 122 Fed. 406, 59 C. C. A. 345; The Oregon, cited supra; The Carroll, 8 Wall. 302, 19 L. Ed. 392; The Isaac Newton, 18 How. 581, 15 L. Ed. 492; New York & Liverpool Mail Steamship Company v. Rumball, 21 How. 372, 16 L. Ed. 144; The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771; The Chicago, 125 Fed. 712, 60 C. C. A. 480; The John Fleming v. The Julia A. Trubee (D. C.) 136 Fed. 486. In The Pierre Corneille (D. C.) 133 Fed. 604, the court held that the failure of the schooner to change her course could not be imputed to her as a fault; that the situation was not such as to indicate to her master that the approaching vessel would fail in her duty of keep-

ing out of the way; and that, in the absence of such clear indication or failure of duty, the ship was justified in maintaining her course. In the case of The Fannie Hayden (recently before this court) 137 Fed. 280, it was held that the Lettie May had the right of way at the time the two schooners came together, and so was the privileged vessel, and it was held that it was her duty to keep her course, that the fact that she did not have a proper lookout was not material, and that, if the privileged vessel held her course, it was all the burdened vessel had a right to expect or require. In that case this court referred to The Fannie, 11 Wall. 238, 20 L. Ed. 114; The Dimock, cited supra; The Columbia, 100 Fed. 991, 41 C. C. A. 150; The Havana (D. C.) 54 Fed. 411. In The Devonian (D. C.) 110 Fed. 588, there was a peculiar state of facts. The colliding vessels had limited sea room, and the duty of the privileged vessel was based upon peculiar circumstances, so that The Devonian did not afford a rule for the case of The Fannie Hayden, nor does it afford a rule for the case which is now before us. In the case at bar, the collision occurred at a place where there was ample searoom, where the privileged vessel had every reason to suppose, until the last moment before the collision, that the steamer had observed her lights and would keep out of her way. Under the sailing rules, and the application of those rules made by the courts, I must conclude that the schooner rightfully held her course, and that no time can be pointed out when she can be held to have been under the duty to change her course. There was, in my opinion, no time up to the moment of the collison when it was her duty to assume that the steamer was not on her part doing her duty and holding the schooner under observation with the intent to keep out of her way. As was the case in Haight v. Bird, supra, the steamer in fact nearly passed clear of the schooner, " any luffing by the schooner would have been of doubtful use," and upon a collision in that event the schooner would have been left exposed to the clear charge of fault. If the schooner had undertaken to take the rules into her own hands, and had changed her course and made herself the burdened vessel, she would have committed the error charged in The Queen Elizabeth, supra. It is perfectly true, as Judge Lowell has said in The Marguerite (D. C.) 87 Fed. 953, that a privileged vessel has its burdens and a burdened vessel has its privileges; but, as he further observed, "certainty is the primary requirement of the rules of navigation." The rule as to "special circumstances" was not intended by Congress, and should not be interpreted by the courts, to create a license law giving a privileged vessel the right at will to waive its privilege and ignore the sailing requirements; for this would allow individual judgment to usurp the place of sailing rules. Situated as the schooner was in the case at bar, she had no right to make herself the burdened vessel, and to thus place the steamship in an anomalous and uncertain position. The case presents an entirely different aspect from that presented by The General (D. C.) 82 Fed. 830, where the privileged vessel saw the steamer coming a mile and a half away, but made no calculation as to the strong tide which was bearing the steamer towards them, and gave her no attention whatever, until he saw her only 40 feet away.

In the case at bar the schooner did give attention, up to the last moment. I can find nothing in her seamanship which warrants the accusation of the respondents in this regard. And then, too, if at the last moment the schooner made any error in seamanship, it was clearly a fault committed when she was confronted with great peril, into which she had been brought by the action of the steamer. Under all the circumstances of the case, I cannot hold that the schooner, in holding her course, was guilty of a fault.

6. In conclusion, it must be said, then, that in the opinion of the court the collision was caused by the failure of the steamer to see the schooner; that this happened from the fact of inattention and lack of vigilance on the part of the lookout; that the schooner was justified in holding her course; that she was justified, also, in not showing a flare-up light; that she did, on the night of the collision, have proper lights brightly burning; and that the defense of unavoidable accident cannot prevail in the case.

The court finds, therefore, that the steamer was solely in fault.

Decree for the libelant. An assessor may be appointed.